**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT NASHVILLE**

**JULY SESSION, 1999**

**FILED**

October 22, 1999

**Cecil Crowson, Jr.
Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9809-CC-00380** |
| | ) | |
| Appellee, | ) | |
| | ) | **COFFEE COUNTY** |
| **V.** | ) | |
| | ) | |
| | ) | **HON. GERALD L. EWELL, SR.** |
| **JOHN THOMAS HEFLIN,** | ) | |
| | ) | |
| Appellant. | ) | **(FIRST DEGREE MURDER)** |

FOR THE APPELLANT:            FOR THE APPELLEE:

**CAMPBELL SMOOT**
District Public Defender

**RACHEL E. WILLIS**
Assistant Public Defender
605 East Carroll Street
P.O. Box 260
Tullahoma, TN  37388

**PAUL G. SUMMERS**
Attorney General & Reporter

**KIM R. HELPER**
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN  37243

**C. MICHAEL LAYNE**
District Attorney General

**KENNETH SHELTON, JR.**
Assistant District Attorney General
P.O. Box 147
Manchester, TN  37355

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

On January 13, 1997, the Coffee County Grand Jury indicted Defendant John Thomas Heflin for first degree murder. After a jury trial on March 9–11, 1998, Defendant was convicted of first degree murder and was sentenced to life in prison. Defendant challenges his conviction, raising the following issues:

1) whether the trial court erred when it allowed the State to introduce the statement of a co-conspirator into evidence; and

2) whether Defendant's conviction is invalid because it was based on the uncorroborated testimony of an accomplice.

After a review of the record, we affirm the judgment of the trial court.

## I. FACTS

Richard Daniel Clark testified that in October of 1996, he was living in the same residence as his mother, Taniese Wilson, his step-father, Al Wilson, and his step-brother, Christopher Wilson. Clark testified that his mother and Al Wilson began living together in August of 1996 and they married on September 28, 1996.

Clark testified that his mother dated Defendant for a number of years before she met Mr. Wilson. Although Ms. Wilson and Defendant stopped dating each other at some point, they began seeing each other again in August of 1996. From August to October of 1996, Defendant spent the night with Ms. Wilson whenever Mr. Wilson was working out of town.

Clark testified that on October 21, 1996, his mother approached him and stated that something bad was going to happen to Mr. Wilson. Ms. Wilson then asked Clark to kill Mr. Wilson, but Clark did not respond. A few days later, Ms. Wilson repeated her request that Clark kill Mr. Wilson. Ms. Wilson stated that "they'd find a place to do it" and she also stated that if Mr. Wilson's death appeared to be an accident, the insurance policy would yield twice as much money. Ms. Wilson explained that after Mr. Wilson was killed, she would claim that he had "been robbed by Mexicans." Ms. Wilson also told Clark that when they obtained the insurance proceeds, she would be able to buy a new house and Clark would be able to buy a new truck. Clark then agreed to kill Mr. Wilson.

Clark testified that on October 26, 1996, Ms. Wilson woke him up and asked him to pick up Defendant. Clark took Ms. Wilson's Beretta and drove to Defendant's residence, but Defendant told him to leave and come back later. Clark returned at approximately 1:00 p.m. and Defendant got in the Beretta. Clark and Defendant then spent the rest of the afternoon and evening traveling between several different locations where they drank beer and smoked marijuana. While Clark and Defendant were at an establishment named Ron's Market at approximately 12:00 a.m., Defendant told Clark that they needed to travel to Normandy. Clark understood this comment to mean that they were going to kill Mr. Wilson

Clark testified that he and Defendant then drove to a store by the Normandy Dam. While they were waiting in the parking lot, Defendant gave Clark a .22 semi-automatic and stated that Clark was going to need the gun. Clark and Defendant then waited in the parking lot until they saw Ms. Wilson and Mr. Wilson drive by in a silver Thunderbird. Clark and Defendant then drove to an area near the dam

where they saw the Thunderbird. Clark parked next to the Thunderbird and Clark and Defendant got out of the Beretta. When he got out of the car, Clark saw that Mr. Wilson was lying on a blanket. Clark then shot Mr. Wilson in the head two times.

Clark testified that after he shot Mr. Wilson, Ms. Wilson and Defendant began arguing and Ms. Wilson stated that they "had to make it look real." Defendant then ripped Ms. Wilson's shirt and Clark and Defendant began arguing about who was going to hit Ms. Wilson in the head. Clark eventually gave the gun to Defendant and began walking to the Beretta. Clark then heard what sounded like a "thump on a melon" and when he turned around, he saw that Ms. Wilson was unconscious. Clark and Defendant then took Mr. Wilson's jewelry and they subsequently threw the jewelry in a field and threw the gun off a bridge. Clark and Defendant then went to the Wilsons' residence where they spent the night.

Christopher Wilson testified that shortly before Mr. and Ms. Wilson were married, Defendant spent the night with Ms. Wilson in her residence. Defendant continued to spend the night with Ms. Wilson after she married Mr. Wilson. Christopher Wilson subsequently reported Defendant's activities to Mr. Wilson, and Mr. Wilson responded that if he was going to be mistreated, he would move back to his home state of Michigan.

Klouse Reccord testified that he went to the Wilson residence on the morning of October 27, 1996. When Reccord arrived at the residence, he saw that Defendant was pacing back and forth in the living room. Shortly thereafter, Reccord gave Defendant a ride to another location. When Reccord told Defendant that Mr. Wilson had been killed during a camping trip, Defendant stated that "it didn't sound

like [Ms. Wilson] to go on a camping trip." Defendant also stated that he had been with Clark all of the previous night and he had come home with Clark.

Terry Holder testified that during the first week of October 1996, he saw Ms. Wilson and Defendant together at Patricia Holder's house. At that time, Mr. Holder questioned Ms. Wilson about her marriage to Mr. Wilson. Ms. Wilson then stated that she had married Mr. Wilson for the kids and for the insurance money. When Mr. Holder asked how Ms. Wilson would obtain insurance money, Ms. Wilson stated, "We're going to have him killed." Defendant then told Ms. Wilson, "That way, you can get that log house you always wanted."

Patricia Holder testified that during the first week of October 1996, Ms. Wilson and Defendant came to her house. Later that evening, Ms. Wilson stated that she and Defendant were going to kill Mr. Wilson and use the insurance money to build a log house. Ms. Holder testified that even though Defendant did not actually say anything in response to Ms. Wilson's statement, he smiled and laughed and agreed with everything Ms. Wilson said.

Josh Brooks testified that on October 22, 1996, he received a telephone call from Ms. Wilson. In response to this call, Brooks obtained a chain and he then drove to the Normandy Dam. When Brooks arrived, he saw that Ms. Wilson's vehicle had become stuck in a culvert. Brooks also noticed that Defendant was with Ms. Wilson. Brooks subsequently attached the chain to his truck and Ms. Wilson's car and he then pulled Ms. Wilson's car out of the culvert.

## II. OUT OF COURT STATEMENT

Defendant contends that the trial court erred when it allowed Terry Holder to testify that during the first week of October 1996, he heard Ms. Wilson say that she was going to have Mr. Wilson killed so that she could collect the insurance money. Specifically, Defendant contends that this evidence was inadmissible hearsay.

Initially, we agree with Defendant that Ms. Wilson's out of court statement was hearsay. Rule 801(c) of the Tennessee Rules of Evidence states that "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." It is evident that the State introduced Ms. Wilson's statement for the purpose of establishing the truth of the matter asserted. Indeed, after Mr. Holder testified that Ms. Wilson stated that they were going to have Mr. Wilson killed so that she could receive the insurance proceeds, the prosecutor repeated this testimony and asked whether that was what Ms. Wilson had said. When Mr. Holder testified that it was, the prosecutor asked Mr. Holder to repeat his testimony again and Mr. Holder complied. The prosecutor then repeated the testimony yet again and asked whether that was what Ms. Wilson had said. It is clear from the amount of emphasis that the prosecutor placed on Ms. Wilson's statement that it was introduced for the truth of the matter asserted. Thus, Ms. Wilson's statement was hearsay that was inadmissible under Rule 802 of the Tennessee Rules of Evidence unless its admission was provided for by an exception to the hearsay rule.

The State contends that Ms. Wilson's statement was admissible under Rule 803(1.2) of the Tennessee Rules of Evidence. Rule 803(1.2) provides that "[a]

statement offered against a party that is . . . a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy" is not excluded by the hearsay rule. In order for a statement to be admissible under this rule, (1) there must be independent evidence that a conspiracy existed, (2) the statement must have been made during the pendency of the conspiracy, and (3) the statement must have been made in furtherance of the conspiracy. State v. Gaylor, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992). We conclude that the evidence was sufficient to establish by a preponderance of the evidence that Defendant and Ms. Wilson conspired to kill Mr. Wilson for the insurance proceeds and that the statement was made during the pendency of the conspiracy. See State v. Stamper, 863 S.W.2d 404, 406 (Tenn. 1993) (holding that the appropriate standard of proof for preliminary facts required for admission of evidence under Rule 803(1.2)(E) is proof by a preponderance of the evidence). However, we also conclude that the statement was not made in furtherance of the conspiracy. Ms. Wilson's statement was merely a declaration of her intent that did absolutely nothing to advance or aid the conspiracy in any way. Indeed, this statement appears to be a part of a casual conversation rather than an attempt to further the conspiracy. Thus, we agree with Defendant that the trial court erred when it allowed Mr. Holder to testify about Ms. Wilson's statement. See State v. Hutchinson, 898 S.W.2d 161, 170 (Tenn. 1994) (noting that casual conversations are not made "in furtherance of" the conspiracy unless they somehow advance the objectives of the conspiracy). However, we conclude that this was harmless error.

The record indicates that Defendant did not object when Patricia Holder testified that Ms. Wilson had stated that she and Defendant were going to kill Mr. Wilson and use the insurance money to build a log house. Moreover, Defendant has

not challenged the admissibility of this evidence on appeal. Not only was the testimony of Ms. Holder substantially similar to that of Mr. Holder, it was also significantly more damaging to Defendant's assertions of innocence. Indeed, after Ms. Holder testified that Ms. Wilson stated that she and Defendant were going to kill Mr. Wilson for the insurance money, Ms. Holder testified that Defendant "agree[ed] with everything she said." Ms. Holder's testimony about Ms. Wilson's statement was clearly admissible because the statement was one in which Defendant "ha[d] manifested an adoption or belief in its truth." See Tenn. R. Evid. 803(1.2)(B). Therefore, even though Ms. Wilson's statement was improperly admitted through the testimony of Mr. Holder, Defendant was not prejudiced because the same evidence was properly admitted through the testimony of Ms. Holder.

In short, we conclude that the trial court erred when it allowed Mr. Holder to testify about Ms. Wilson's statement. However, in light of the fact that Ms. Holder gave nearly identical testimony about Ms. Wilson's statement, any error was harmless. See Tenn. R. App. P. 36(b). Defendant is not entitled to relief on this issue.

### III. CORROBORATION OF ACCOMPLICE TESTIMONY

Defendant contends that his conviction is invalid because it was based on the uncorroborated testimony of his accomplice, Clark.

In Tennessee, it is well-settled that a defendant cannot be convicted on the uncorroborated testimony of an accomplice. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). However,

[t]his corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

Id. In other words, "only slight circumstances are required to corroborate an accomplice's testimony." State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Whether an accomplice's testimony has been sufficiently corroborated is a question for the jury. Bigbee, 885 S.W.2d at 803.

We conclude that the other evidence in this case is sufficient to establish at least the "slight circumstances" necessary to corroborate Clark's testimony. First, Brooks saw Defendant and Ms. Wilson together a few days before the murder in the same area where the murder was committed. Second, Defendant told Reccord that he had been with Clark all night on October 26, 1996, and he had come back to Ms. Wilson's residence with Clark. Third, and most significantly, when Ms. Wilson told Ms. Holder that she and Defendant were going to kill Mr. Wilson in order to obtain the insurance proceeds, Defendant smiled and laughed and agreed with everything Ms. Wilson said. We conclude that while this evidence was not adequate, in and of itself, to support a conviction, the evidence "fairly and legitimately tends to connect [Defendant] with the commission of the crime charged." Thus, Clark's testimony was sufficiently corroborated. Defendant is not entitled to relief on this issue.

Accordingly, the judgment of the trial court is AFFIRMED.

_____
THOMAS T. WOODALL, Judge

CONCUR:

_____
JERRY L. SMITH, Judge

_____
NORMA McGEE OGLE, Judge