IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 26, 2002 Session

## MILTON LEE COOPER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 227342     Stephen M. Bevil, Judge**

**No. E2001-01527-CCA-R3-PC**
**November 18, 2002**

A Hamilton County jury convicted the Petitioner of first degree felony murder and conspiracy to commit aggravated robbery.  The Petitioner was sentenced to life imprisonment for the murder conviction and to eight years incarceration for the conspiracy conviction.  This Court affirmed the convictions, and the Tennessee Supreme Court denied permission to appeal.  The Petitioner then filed a petition for post-conviction relief alleging that he received ineffective assistance of counsel at trial and on direct appeal.  Specifically, the Petitioner alleged that counsel: (1) failed to request an alibi instruction at trial; (2) failed to raise the alibi instruction issue on direct appeal; and (3) failed to challenge an erroneous accomplice instruction at trial and on appeal.  Also, the Petitioner alleged that the trial court: (1) failed to instruct the jury on the defense of alibi, thus violating the Petitioner's due process rights and his right to a jury trial; and (2) failed to instruct the jury on "the natural and probable consequences rule."  Following a hearing, the post-conviction court denied the petition for post-conviction relief, and this appeal ensued.  Finding no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Milton Lee Cooper.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William H. Cox, III, District Attorney General; Christopher D. Poole, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

#### A. Trial

On direct appeal, this Court summarized the relevant facts of the underlying case as follows:

Shortly before 11:00 p.m. on April 13, 1994, Edward Ray Horner was working as a clerk at the Golden Gallon convenience store in Red Bank. Two men entered the store. One man wore an athletic starter jacket and white cap. The other man, wearing a bulky jacket and a ski mask, engaged in a struggle with Mr. Horner which resulted in his receiving a shotgun wound to his abdomen. He died a short time later. The crime was captured in part on surveillance cameras, which showed that a number of items on the front sales counter were disarranged and/or had fallen onto the floor. The shooting also was witnessed by a customer, but he was unable to provide a description of the shooter.

As a result of the publicity received after the shooting, an individual came forward and provided the police with information about her niece, Emily Nealy, and Nealy's boyfriend, Senneca Harris. Further interviews led police to other persons ultimately identified as being involved in the murder, including the [Petitioner], Milton Lee Cooper.

Three individuals involved in the events testified against the [Petitioner] at his trial: Emily Nealy, Timothy Gamble, and Odis Lawson, Jr. At the time of trial Gamble had already entered a plea of guilty to being an accessory after the fact and Odis Lawson had pled guilty to criminal responsibility for facilitation of first degree murder. Nealy, a juvenile, had neither been charged nor reached any agreement with the state when she testified. The two men had prior criminal convictions, and Emily Nealy had a prior juvenile record.

According to the testimony of these three individuals, they all lived in or around the Westside projects in Hamilton County, Tennessee. Early on April 13, 1994, [the Petitioner], Timothy Gamble, and Senneca Harris decided to go to Hamilton Place Mall and snatch a purse. They used a car belonging to the [Petitioner]'s girlfriend, Felicia Tremell. They asked Emily Nealy, Harris' girlfriend, to follow them in her automobile and act as a distraction so that they could more easily rob their victims. Nealy followed the three men in a separate car. On the way to the mall she changed her mind and returned to the Westside projects. The three men continued, however, and did rob an elderly woman of her purse. During this incident Timothy Gamble drove the car and Senneca Harris snatched the purse. [The Petitioner] remained in the back seat of the car. The three then returned to Westside and parked the car by a dumpster several blocks from the projects.

Because Cooper had used her car in the robbery, he told his girlfriend, Felicia Tremell, that her car had been stolen. She called and reported that fact to the police. While Tremell waited to speak to officers, the other individuals left the vicinity.

Later that evening [the Petitioner] Cooper, Nealy, Harris, Gamble and Lawson congregated again in Nealy's Mazda in a parking lot near the projects. They drank beer, smoked marijuana, and began discussing whether to commit armed robberies. Harris had with him a black athletic starter jacket. At one point [the

-2-

Petitioner] went to his house and returned to the car with a jacket and a sawed-off shotgun.

The group then traveled toward Hixson. They went to a Conoco gas station on Main Street and purchased more beer. They proceeded to drive by other gas stations as well, and Lawson went into one store. However, they observed no potential robbery victims. At some point Nealy again decided that she did not wish to be involved in the plan and was let out of her car near the river. She washed off in the river and then walked around and waited on the riverbank for the group to return and pick her up.

At about 10:15 p.m. a black male wearing a black Raiders starter jacket and ball cap entered a Golden Gallon convenience store where Sandra White worked as a clerk. Lawson testified that he was the man and that he borrowed the jacket from Harris because his own jacket had a distinctive symbol on it. White testified at trial and identified a photograph of Lawson. She stated that Lawson looked around the store, informed her that he could find no Red Bull beer, and asked her to check the cooler. White, being scared and suspicious, motioned toward a van just entering the parking lot and told Lawson that her "friends" were coming. Lawson asked her about what market might stock Red Bull beer, and she immediately gave him directions to another Golden Gallon store.

The individuals then drove to the Golden Gallon store at which Edward Ray Horner was working. They parked the car and Odis Lawson went toward the store. Shortly thereafter he returned to the car and indicated that there were few people inside and no police in the vicinity. At that point [the Petitioner], carrying his sawed-off shotgun, exited the car with Senneca Harris and headed toward the store. [The Petitioner] also took his jacket, which he normally wore inside-out. Harris was wearing his own starter athletic jacket and a white cap. [The Petitioner] and Harris entered the Golden Gallon store. One eyewitness saw the shooting but could not identify the shooter. Surveillance camera photographs showed a male in a ski mask and a jacket later identified as [the Petitioner]'s. That male engaged in a struggle with Horner and shot him. Officers who arrived on the scene later found that items on the front sales counter were moved around and knocked to the floor.

[The Petitioner], still holding the shotgun, ran with Harris back to the car and told Gamble and Lawson to hurry. According to Gamble and Lawson, both men seemed nervous. Gamble testified that Harris asked [the Petitioner] "Why did you shoot him?". Lawson drove the car away. The group then picked up Nealy at the river, and returned to the Westside projects. According to Lawson, the [Petitioner] pulled the gun and his jacket out of the car, left, and then returned without the two items. The group then dispersed.

State v. Milton Lee Cooper, No. 03C01-9706-CR-00202, 1998 Tenn. Crim. App. LEXIS 923, at **2-7 (Tenn. Crim. App., Knoxville, Sept. 9, 1998).

B.  Hearing on the Petition for Post-Conviction Relief

The following testimony was presented at the hearing on the petition for post-conviction relief:  The Petitioner, Milton Cooper, testified that Robert Meeks and Phillip Duval represented him during his trial.  He stated that prior to trial, he spoke with his attorneys and gave them the names of witnesses who would testify that they were with him at the time the crime was committed and who could provide him with an alibi.  He testified that one of the witnesses, Mr. Fuquay, was called to testify at trial.  The Petitioner reported that he brought other witnesses to court, but his attorneys did not call them as witnesses.

The Petitioner acknowledged that when he was "little" and "way before this case" he was treated for mental illness.[1]  The Petitioner testified that he had a "suicide problem" and a "peer pressure" problem.  He stated he was treated for "a lot of things."  The Petitioner stated that he had been treated for mental illness on more than one occasion as a result of being in the juvenile court system for criminal activity.  He also reported that he had been kept overnight in mental institutions a "whole bunch of times."  The Petitioner testified that he did not discuss his mental health issues with his attorneys prior to this trial.  He recalled, "We didn't talk about it, we just bring it up and it was over with."

The Petitioner testified that at his sentencing hearing, three of his school counselors testified about his mental condition.  He stated that his mother gave his attorneys the names of the counselors.  The Petitioner testified that he did not recall talking with his attorneys about whether he was competent or whether he understood enough about a trial to be held responsible for the crimes in this case.  He testified that his attorneys did not ask him if he had any mental problems.  The Petitioner stated that he did not discuss with his attorneys the possibility of having a mental competency hearing prior to trial.

On cross-examination, the Petitioner stated that he met with his attorneys two or three times prior to trial and that during the meetings, his attorneys explained to him what kind of case he was facing.  He stated that he did "not really" understand the charges.  The Petitioner claimed that at first he thought he was being charged with violating house arrest.  He testified that he knew what offenses he was charged with when he was booked.  The Petitioner reported that he testified at his sentencing hearing and that his defense was that he had nothing to do with the offense.

Phillip Duval, one of the Petitioner's attorneys at trial, testified that he could not recall his discussions with the Petitioner regarding any competency issues; however, he noted that he had "numerous conferences and meetings" with the Petitioner.  He also testified that the attorneys were in contact with the Petitioner's mother and the Petitioner's girlfriend on "many occasions," and there was never an issue raised regarding whether the Petitioner was competent to stand trial.  Duval

---

[1]Although the majority of the testimony at the post-conviction hearing involved the Petitioner's competency, the issue was not addressed in either party's brief.  Furthermore, there is no evidence in the record before us that the Petitioner was not competent to stand trial.

-4-

testified that he did not notice anything about the Petitioner's ability to communicate that would have put them on notice of any mental issues.

The defense asked Duval how information was developed from the Petitioner's school counselors about the Petitioner being diagnosed as mentally retarded. Duval responded that that part of the case was handled by Robert Meeks. He stated that Meeks "got appointed later on into the case and that was something that he worked on." Duval stated that he was not aware of any pretrial interviews that were conducted with the Petitioner's school counselors or whether any mental health records were gathered prior to trial.

Regarding the alibi issue, Duval testified that he discussed with the Petitioner the possibility of presenting evidence that the Petitioner was not at the scene of the offense. According to Duval, the Petitioner "made available for [counsel] several people whom he believed would serve as alibi witnesses and [counsel] talked to everyone that [the Petitioner] wanted [them] to talk to." Duval admitted that it did not occur to him to specifically ask for a jury instruction regarding an alibi. However, he felt "certain that there must have been an instruction regarding [the] credibility of witnesses."

On cross-examination, Duval testified that he had been practicing law for about twenty-five years and that he had been practicing criminal law for about twenty-two years. He stated that he had had "quite a few" jury trials and that he had defended persons accused of murder in jury trials. Duval testified that he met with the Petitioner "many, many, many times." He reported that he spent "[a] lot of time" working on the Petitioner's trial. Duval maintained that he never had any problems communicating with the Petitioner. He stated, "[The Petitioner] was aware of the case, aware of the facts, aware of the evidence against him." Duval testified that the Petitioner "missed a few appointments with [him], but [the Petitioner] made a lot of appointments with [Duval]." He maintained that he did not have any reason to think that the Petitioner might be incompetent or unable to aid in his defense. Duval stated that the Petitioner "understood what was going on and he was quite helpful . . . in working on the case." Duval testified that at the sentencing hearing, the Petitioner testified effectively and was sentenced only to life instead of life without the possibility of parole. Duval stated that he did not handle the Petitioner's appeal, so he did not know what issues were raised on appeal.

## II. Analysis

### A. Post Conviction Standard of Review

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the

evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

## B. Post Conviction Waiver

We also note that Tennessee Code Annotated § 40-30-206(g) contains provisions governing the waiver of post-conviction allegations. According to this statute:

A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

 (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

 (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Tenn. Code Ann. § 40-30-206(g).

## C. Jury Instruction on Alibi Defense

The Petitioner argues that the trial court erred by failing to instruct the jury on the defense of alibi. A trial court has the affirmative duty to instruct the jury on every issue raised by the proof, including the accused's theory of defense, and specifically including alibi. Poe v. State, 370 S.W.2d 488, 491 (Tenn. 1963). The trial court must instruct the jury on the defense of alibi when it is "fairly raised" by the evidence. Manning v. State, 500 S.W.2d 913, 915 (Tenn. 1973). This duty exists irrespective of a request for the instruction by the defendant. Poe, 370 S.W.2d at 491. Alibi is fairly raised in the following instances: (1) where the defendant's alibi has been corroborated by other credible witnesses, (2) where the victim has been unable to identify the defendant, and (3) where the proof against the defendant is wholly circumstantial. Manning, 500 S.W.2d. at 916. The failure to charge the jury with the defense of alibi when it has been fairly raised by credible evidence is reversible error. Moffitt v. State, 29 S.W.3d 51, 57 (Tenn Crim. App. 1999); State v. John A. Boatfield, No. E2000-01500-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 955, at *45 (Tenn. Crim. App., Knoxville, Dec. 20, 2001).

We note that the Petitioner's challenge to the jury instructions is waived because he failed to raise the issue on direct appeal. See Tenn. Code Ann. § 40-30-206(g). However, because the Petitioner also claims that his trial counsel was ineffective for failing to request an alibi instruction, we will address the alibi instruction issue in that context. See, e.g. Fred Edmond Dean v. State, No. E1998-00135-CCA-R3-PC, 2000 Tenn. Crim. App. LEXIS 283, at *7 (Tenn. Crim. App., Knoxville, Mar. 31, 2000).

D. Ineffective Assistance of Counsel

The Petitioner argues that his trial and appellate counsel were ineffective. Specifically, he argues that trial counsel failed to make a special request for an alibi instruction and that appellate counsel failed on direct appeal to raise the issue of the trial court's failure to give an alibi instruction. The Petitioner also argues that trial counsel failed to challenge the trial court's allegedly erroneous instruction to the jury regarding accomplice corroboration and that appellate counsel failed to raise the issue on direct appeal.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

1. Ineffectiveness of Trial Counsel Regarding Alibi Defense

The Petitioner argues that his trial attorneys were ineffective for failing to request that the trial court instruct the jury on the subject of alibi. The post-conviction court determined that an alibi defense was not fairly raised by the evidence at trial, thus the Petitioner's trial attorneys were not ineffective for failing to request an alibi instruction. After a careful de novo review of the trial record and the findings of the post-conviction court, we agree with the post-conviction court.

From our review of the trial record, we note that the testimony purporting to establish an alibi for the Petitioner was presented by Lee Fuquay.[2] Fuquay testified at trial that on April 13, 1994, he worked at Bee's Restaurant until 8:30 p.m. He recalled that after work, he and Antonio Foster stopped by a store to buy beer and cigarettes and then went to the Defendant's house around 9:00 p.m. Fuquay testified that he told the Defendant that they were going to the home of a person named JoAnn. According to Fuquay, the Defendant stated, "I'll meet you-all around there."

Fuquay testified that as soon as they parked at JoAnn's place, the Defendant "was coming through the front door" and that is when they "started drinking." He stated that JoAnn's house is about a two or three-minute walk from Felecia Tremell's house, where the Defendant was living at the time. Fuquay testified that they "just drank and listened to music and stood out on the porch" at JoAnn's house. He testified that he left JoAnn's house around 3:30 a.m., and the Defendant was still there.

On cross-examination, Fuquay testified that at the time of trial, he had known the Defendant for about two and a half years. He stated that when he first arrived at the Defendant's place, the Defendant told him that his car had been stolen. According to Fuquay, the Defendant stated that he reported the stolen car to police. He stated that he was inside JoAnn's house when the Defendant arrived. Fuquay testified that when the Defendant arrived, Antonio Foster, JoAnn, and a "white girl[]" were also there. Fuquay testified that they drank "about four or five quarts" that evening. He stated that at the time, JoAnn and Odis Lawson were dating. He maintained that the Defendant was still at JoAnn's house when he left around 3:30 a.m.

The post-conviction court, in determining that an alibi defense was not fairly raised by the evidence, stated the following:

Now, the other issue is the alibi issue which is brought up, and I was looking over that. There was really overwhelming proof in this case of [the Petitioner's] guilt. There were a number of the co-defendants who were over there with him at the store when this occurred. One of them testified he went in with a shotgun, they went by the house and stopped and he picked up the shotgun and the jacket. This was an unusual jacket, because everybody testified he wore it inside out. The jacket was on the videotape, the co-defendants identified the jacket. Even Felicia Trammel [sic], his girlfriend, was called to come in, the mother of his child was called to testify. She identified the jacket as being his, the jacket that was introduced and identified as the one that the person was wearing.

She also said that her car was stolen, she reported it stolen, then later found out it wasn't stolen, that [the Petitioner] told her to say it was stolen. So she wasn't a very helpful witness, but she corroborated what the co-defendants had said.

There was no proof whatsoever to support an alibi defense, except for the one witness, Lee Fuqua, that the defense called. He knew the [Petitioner] and he knew

---

[2]Although a transcript of the trial was not included in the record on appeal, we may, as the Petitioner points out, take judicial notice of the records of our Court. See Delbridge v. State, 742 S.W.2d 266, 267 (Tenn. 1987).

O.J., Otis Lawson, the other co-defendant in the case. Said he got off from work and went to the [Petitioner's] house, that they were going to "kick it," started drinking at Joanne's house about 9:00, they listened to music, stayed around and they left about three. He was cross-examined from the fact - - of course, he admitted that O.J. was a member of a gang, had the Cript signs on his arms and talked about the original gangsters. And he, of course, talked about [the Petitioner], the fact that he and O.J. didn't like each other.

He talked about [the Petitioner], on cross-examination, was living with Felicia at the time, who was the mother of his child, and he was [a] close friend of [the Petitioner's]. And there was some question about the period of time, how much time he was with him, and whether this covered the entire period of time or whether it only covered a short period of time.

Based upon that one witness, this court did not feel that the defense fairly raised the issue of alibi. It was very ambiguous, this one witness, and in light of the overwhelming proof that the [S]tate had as to [the Petitioner's] presence, identification of the jacket, his participation in this crime, the corroborating testimony about his part in it, I just feel like that that alibi defense, through this one witness who was not real clear and it did not cover the entire - - I just did not feel that the issue was fairly raised, so, therefore, I felt like there was no need to charge the jury on alibi.

We agree with the post-conviction court that the defense of alibi was not fairly raised by the evidence. Fuquay was the only witness that testified regarding the Petitioner's possible alibi. He stated that he met the Petitioner around 9:00 p.m. on the night of the offense and that when he left the house where they had been "kick[ing] it" around 3:30 a.m. the next morning, the Petitioner was still there. Thus, Fuquay purports to outline a time period covering more than six and one-half hours. However, Fuquay did not testify that he was with the Petitioner at 11:00 p.m., when the offense was committed. Nor does Fuquay ever state that he was with the Petitioner or that the Petitioner was physically in his presence for the entire period of time that he describes. In addition, Fuquay admitted that he had been drinking that evening. Finally, during cross-examination, Fuquay stated that he often associated with the same group of people, which included the Petitioner, at about the same time of day. He claimed to remember that day in particular because the Petitioner told him that his car had been stolen.

While we agree with Petitioner's assertion in his reply brief that the determination of which witnesses to believe when an alibi defense is raised is for the jury to determine under proper instructions, the trial court must first determine whether or not an alibi defense has been fairly raised.

The post-conviction court determined that insufficient evidence was presented at trial to "fairly raise" an alibi defense. We agree. Therefore, it logically follows that the Petitioner did not meet his burden of proving by clear and convincing evidence that his trial attorneys were ineffective for failing to request an alibi instruction.

The Petitioner has also failed to prove by clear and convincing evidence that the alleged ineffectiveness of his attorneys in failing to request an alibi instruction resulted in prejudice to him. The evidence of the Petitioner's guilt was overwhelming. In our view, the Petitioner has failed to show a reasonable probability that had his trial attorneys requested an alibi instruction (and assuming the trial court would have granted the request), the jury would have had reasonable doubt regarding the Petitioner's guilt. See Strickland, 466 U.S. at 695. In our view, the Petitioner has failed to show a reasonable probability of reasonable doubt "sufficient to undermine confidence in the outcome." See id. at 694. Therefore, the Petitioner has failed to satisfy the "prejudice prong" of Strickland.

### 2. Ineffectiveness of Appellate Counsel Regarding Alibi Defense

The Petitioner also argues that appellate counsel was ineffective for failing to raise on direct appeal the issue of an alibi instruction. The same principles apply in determining the effectiveness of both trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). However, this issue was not argued at the post-conviction hearing, and no evidence was presented at that hearing to support this claim. Thus, this issue was not ruled on by the post-conviction court and is not properly before our Court. See Tenn. Code Ann. § 40-30-206(g); Torry Caldwell v. State, No. 01C01-9703-CC-00115, 1999 Tenn. Crim. App. LEXIS 154, at *7 (Tenn. Crim. App., Nashville, Feb. 18, 1999).

In our view, even if this issue were properly before us, it has no merit. Because the alibi issue was not fairly raised at trial and because counsel's decision regarding which issues to raise on direct appeal is a strategic one, we do not find merit in the Petitioner's argument that his appellate counsel was ineffective for failing to raise the alibi issue on direct appeal.

### 3. Ineffectiveness of Trial and Appellate Counsel Regarding Accomplice Instruction

Next, the Petitioner argues that his trial attorneys were ineffective by failing to challenge the trial court's instruction to the jury regarding accomplice testimony and that appellate counsel was ineffective for failing to raise the issue on direct appeal. Specifically, the Petitioner argues that the trial court failed to declare three of the witnesses to be accomplices as a matter of law. The trial court gave the following jury instruction regarding accomplices:

> An accomplice is a person who joins another person in committing a crime. The accomplice must do so knowingly, voluntarily, and sharing the intent of the other person in doing the crime. In this case it is a question for you to determine whether the witnesses Senneca Harris, Timothy Gamble, and Odis Lee Lawson, Jr., were accomplices in this alleged crime.
> The testimony of an accomplice by itself cannot convict the defendant. The accomplice's testimony must be supported by other evidence. This other evidence must independently lead to the conclusion that a crime was committed and that the defendant was involved in it. This other supporting evidence must connect the defendant to the crime. The supporting evidence may be direct or circumstantial and it need not be sufficient by itself to justify a conviction. The supporting evidence is

enough if it fairly and legitimately tends to connect the defendant with the crime charged. It is for you, the jury, to decide whether an accomplice's testimony has been sufficiently supported by other evidence.

A criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). An accomplice is a person who knowingly, voluntarily and with a common intent unites with the principal offender in the commission of a crime. State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). In Bethany v. State, this Court stated:

> The question of who determines whether a person is an accomplice depends upon the facts of each case. When the facts of a witness' participation in a crime are clear and undisputed, it is a question of law for the court to decide. When such facts are in dispute or susceptible of an inference that a witness may or may not be an accomplice, it then becomes a question of fact for the jury to decide.

565 S.W.2d 900, 903 (Tenn. Crim. App. 1978); State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). Whether the testimony of an accomplice has been sufficiently corroborated is a question for the jury. State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). However, corroborating evidence need not be sufficient in and of itself to support a conviction, but it must fairly connect the defendant with the commission of the crime. State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992).

We conclude that the Petitioner has waived this issue because he failed to raise it in any of his post-conviction pleadings. See Tenn. Code Ann. § 40-30-206(g).[3] In addition, no evidence on this issue was presented at the post-conviction hearing, and the post-conviction court did not make a ruling. Thus, this issue is not properly before our Court.

However, even if this issue were properly before us, we find it to be without merit. We conclude that sufficient evidence was presented to corroborate the testimony of the accomplices, and thus, the Petitioner was not prejudiced. The offense was captured in part on surveillance cameras, and the man who committed the crime was wearing an unusual jacket, which was later identified by the Petitioner's girlfriend, Felicia Tremell, as belonging to the Petitioner. The man wearing the unusual jacket struggled with the victim and shot him. Sufficient evidence was presented at trial to corroborate the testimony of the accomplices in this case.

### E. Natural and Probable Consequences Rule

The Petitioner argues that the trial court erred by failing to instruct the jury on the natural and probable consequences rule as part of the instruction on criminal responsibility for the acts of another, and that the jury thus did not consider an essential element of the State's theory of criminal responsibility. The natural and probable consequences rule "underlies the doctrine of criminal

---

[3]Petitioner does raise in one pleading the claim that witness Emily Nealy was not designated an accomplice, which is a separate issue that the Petitioner also failed to present to the post-conviction court for determination.

responsibility and is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion." <u>State v. Howard</u>, 30 S.W.3d 271, 276 (Tenn. 2000). This issue is waived because the Petitioner failed to raise it on direct appeal. <u>See</u> Tenn. Code Ann. § 40-30-206(g).

Accordingly, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE