IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 3, 2004

## JOHN T. HEFLIN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Coffee County**
**No. 31,119    L. Craig Johnson, Judge**

-------

**No. M2003-01032-CCA-R3-PC - Filed April 30, 2004**

-------

On March 11, 1998, the petitioner, John T. Heflin, was convicted of first degree murder and sentenced to life imprisonment. On appeal this Court affirmed the judgment of conviction and the sentence. See, State v. Heflin, 15 S.W.3d 519 (Tenn. Crim. App. 2001). The petitioner subsequently sought post-conviction relief alleging that his trial attorney was ineffective in failing to object to the testimony of a state witness. The trial court concluded that the failure to object to this witness' testimony did not amount to the ineffective assistance of counsel. After a review of the record and the applicable authorities we conclude that the petitioner received the effective assistance of counsel at trial and therefore the judgment of the post-conviction court is AFFIRMED.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

H. Thomas Parsons, Manchester, Tennessee, for the appellant, John T. Helfin.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Mickey Layne, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

On direct appeal this Court summarized the evidence underlying the petitioner's first degree murder conviction as follows:

Richard Daniel Clark testified that in October of 1996, he was living in the same residence as his mother, Taniese Wilson, his step-father, Al Wilson, and his step-brother, Christopher Wilson. Clark testified that his mother and Al Wilson began living together in August of 1996 and they married on September 28, 1996.

Clark testified that his mother dated Defendant for a number of years before she met Mr. Wilson. Although Ms. Wilson and Defendant stopped dating each other at some point, they began seeing each other again in August of 1996. From August to October of 1996, Defendant spent the night with Ms. Wilson whenever Mr. Wilson was working out of town.

Clark testified that on October 21, 1996, his mother approached him and stated that something bad was going to happen to Mr. Wilson. Ms. Wilson then asked Clark to kill Mr. Wilson, but Clark did not respond. A few days later, Ms. Wilson repeated her request that Clark kill Mr. Wilson. Ms. Wilson stated that "they'd find a place to do it" and she also stated that if Mr. Wilson's death appeared to be an accident, the insurance policy would yield twice as much money. Ms. Wilson explained that after Mr. Wilson was killed, she would claim that he had "been robbed by Mexicans." Ms. Wilson also told Clark that when they obtained the insurance proceeds, she would be able to buy a new house and Clark would be able to buy a new truck. Clark then agreed to kill Mr. Wilson.

Clark testified that on October 26, 1996, Ms. Wilson woke him up and asked him to pick up Defendant. Clark took Ms. Wilson's Beretta and drove to Defendant's residence, but Defendant told him to leave and come back later. Clark returned at approximately 1:00 p.m. and Defendant got in the Beretta. Clark and Defendant then spent the rest of the afternoon and evening traveling between several different locations where they drank beer and smoked marijuana. While Clark and Defendant were at an establishment named Ron's Market at approximately 12:00 a.m., Defendant told Clark that they needed to travel to Normandy. Clark understood this comment to mean that they were going to kill Mr. Wilson.

Clark testified that he and Defendant then drove to a store by the Normandy Dam. While they were waiting in the parking lot, Defendant gave Clark a .22 semi-automatic and stated that Clark was going to need the gun. Clark and Defendant then waited in the parking lot until they saw Ms. Wilson and Mr. Wilson drive by in a silver Thunderbird. Clark and Defendant then drove to an area near the dam where they saw the Thunderbird. Clark parked next to the Thunderbird and Clark and Defendant got out of the Beretta. When he got out of the car, Clark saw that Mr. Wilson was lying on a blanket. Clark then shot Mr. Wilson in the head two times.

Clark testified that after he shot Mr. Wilson, Ms. Wilson and Defendant began arguing and Ms. Wilson stated that they "had to make it look real." Defendant then ripped Ms. Wilson's shirt and Clark and Defendant began arguing about who was going to hit Ms. Wilson in the head. Clark eventually gave the gun to Defendant and began walking to the Beretta. Clark then heard what sounded like a "thump on a melon" and when he turned around, he saw that Ms. Wilson was unconscious. Clark and Defendant then took Mr. Wilson's jewelry and they subsequently threw the jewelry in a field and threw the gun off a bridge. Clark and Defendant then went to the Wilsons' residence where they spent the night.

Christopher Wilson testified that shortly before Mr. and Ms. Wilson were married, Defendant spent the night with Ms. Wilson in her residence. Defendant continued to spend the night with Ms. Wilson after she married Mr. Wilson. Christopher Wilson subsequently reported Defendant's activities to Mr. Wilson, and Mr. Wilson responded that if he was going to be mistreated, he would move back to his home state of Michigan.

Klouse Reccord testified that he went to the Wilson residence on the morning of October 27, 1996. When Reccord arrived at the residence, he saw that Defendant was pacing back and forth in the living room. Shortly thereafter, Reccord gave Defendant a ride to another location. When Reccord told Defendant that Mr. Wilson had been killed during a camping trip, Defendant stated that "it didn't sound like [Ms. Wilson] to go on a camping trip." Defendant also stated that he had been with Clark all of the previous night and he had come home with Clark.

Terry Holder testified that during the first week of October 1996, he saw Ms. Wilson and Defendant together at Patricia Holder's house. At that time, Mr. Holder questioned Ms. Wilson about her marriage to Mr. Wilson. Ms. Wilson then stated that she had married Mr. Wilson for the kids and for the insurance money. When Mr. Holder asked how Ms. Wilson would obtain insurance money, Ms. Wilson stated, "We're going to have him killed." Defendant then told Ms. Wilson, "That way, you can get that log house you always wanted."

Patricia Holder testified that during the first week of October 1996, Ms. Wilson and Defendant came to her house. Later that evening, Ms. Wilson stated that she and Defendant were going to kill Mr. Wilson and use the insurance money to build a log house. Ms. Holder testified that even though Defendant did not actually say anything in response to Ms. Wilson's statement, he smiled and laughed and agreed with everything Ms. Wilson said.

Josh Brooks testified that on October 22, 1996, he received a telephone call

from Ms. Wilson. In response to this call, Brooks obtained a chain and he then drove to the Normandy Dam. When Brooks arrived, he saw that Ms. Wilson's vehicle had become stuck in a culvert. Brooks also noticed that Defendant was with Ms. Wilson. Brooks subsequently attached the chain to his truck and Ms. Wilson's car and he then pulled Ms. Wilson's car out of the culvert.

State v. Heflin, 15 S.W.3d at 521-22

## Post-Conviction Proceedings

At the post-conviction hearing, the petitioner testified that his trial counsel did not go along with his "legal strategies." He stated that his main complaint was that counsel failed to object to Patricia Holder's testimony at trial. The petitioner admitted that the Court of Criminal Appeals held that Ms. Holder's testimony was admissible. He also admitted that at trial, his attorney objected to Terry Holder's testimony, which was similar to that of Ms. Holder. The petitioner testified that his attorney was prepared for trial and that she interviewed every witness; however, he claimed that she withheld evidence from him.

Trial counsel testified that she called every witness that the petitioner wanted to call, and she worked very hard on the petitioner's case. She stated that she tracked down all of the State's witnesses, and she was as prepared as she had ever been for a trial. Counsel testified that she kept the petitioner informed throughout the trial. She stated that the jurors were interviewed after trial, and they could not get past the fact that the petitioner, who was having an affair with Taniese Wilson, spent the night at the victim's house with Ms. Wilson on the night of the murder. She stated: "Why would he have spent the night at Taniese Wilson's house unless he knew Al Wilson was dead?"

## Standard of Review on Claims of Ineffective Assistance of Counsel

The petitioner contends that he received ineffective assistance of counsel because counsel failed at trial to object to the hearsay testimony of Patricia Holder to the effect that Ms. Holder had heard Taniese Wilson say that Ms. Wilson and the petitioner were going to kill Ms. Wilson's husband, Mr. Al Wilson, for the insurance money. However, the evidence does not preponderate against the post-conviction court's findings that the petitioner received effective assistance of counsel.

In determining whether counsel provided effective assistance at trial, a court must decide whether counsel's performance was within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To succeed on a claim that his

counsel was ineffective at trial, a post-conviction petitioner bears the burden of showing that his counsel made errors so serious that he was not functioning as counsel as guaranteed under the Sixth Amendment and that the deficient representation prejudiced the petitioner, resulting in a failure to produce a reliable result. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). To satisfy the second prong, the petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding petitioner's guilt. Strickland, 466 U.S. at 695.

In a post-conviction evidentiary hearing a petitioner must do more than merely present evidence tending to show incompetent representation and prejudice; he must prove his factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). When an evidentiary hearing is held, findings of fact made by the court conducting it are conclusive and binding on this Court, unless the evidence preponderates against them. Cooper. 849 S.W.2d at 746.

When reviewing trial counsel's actions, this Court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). A "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. At 2065. Deference is given to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard, 629 S. W.2d at 9.

With respect to the admissibility of Ms. Holder's testimony regarding Ms. Wilson's statement that she and the petitioner planned to kill Al Wilson for the insurance money, this Court stated on direct appeal:

> Indeed, after Ms. Holder testified that Ms. Wilson stated that she and Defendant [Petitioner] were going to kill Mr. Wilson for the insurance money, Ms. Holder testified that Defendant "agree[ed] with everything she said." *Ms. Holder's testimony about Ms. Wilson's statement was clearly admissible because the statement was one in which Defendant "ha[d] manifested an adoption or belief in its truth." Therefore, even though Ms. Wilson's statement was improperly admitted through the testimony of Mr. Holder, Defendant was not prejudiced because the same evidence was properly admitted through the testimony of Ms. Holder.* (Emphasis supplied)

State v. Heflin, 15 S.W.3d at 523.

We cannot see how counsel can be held to be ineffective for failing to object to clearly admissible testimony.  We are unaware of any duty on the part of counsel to object to "clearly admissible" testimony.  It therefore appears to this Court that the trial judge's determination that trial counsel's performance was well within the range of that expected of reasonable attorneys is fully supported by the record.

Conclusion

In light of the foregoing, the judgment of the post-conviction court is AFFIRMED.

_____          _____
                                           JERRY L. SMITH, JUDGE