IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 2, 2001

## STATE OF TENNESSEE v. GEORGE R. CROFT

**Direct Appeal from the Criminal Court for Shelby County
Nos. 96-12125, -12126     W. Otis Higgs, Jr., Judge**

**No. W2001-00134-CCA-R3-CD - Filed November 20, 2002**

A Shelby County jury found the Defendant guilty of especially aggravated robbery and felony murder in the perpetration of a robbery. The trial court sentenced the Defendant as a Range I violent offender to life imprisonment for the felony murder conviction and to twenty-two years for the especially aggravated robbery conviction. On appeal, the Defendant argues that the trial court erred by failing to give a requested jury instruction on lost or destroyed evidence, that the evidence presented by an accomplice was not sufficiently corroborated to support the convictions, and that the trial court erred in sentencing the Defendant for the especially aggravated robbery conviction by not including in the record specific findings regarding the enhancement and mitigating factors considered in sentencing him. We affirm the Defendant's convictions, but remand to the trial court for a new sentencing hearing for the especially aggravated robbery conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part;
Case Remanded in Part.**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

A C Wharton, Jr., and Tony N. Brayton (on appeal); and Timothy J. Albers and Sherrye J. Brown (at trial), Memphis, Tennessee, for the appellant, George R. Croft.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and J. Robert Carter, Jr., and David C. Henry, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I. FACTS

Brenda McKinney testified that she was driving to a Mapco convenience store on the corner of Alcy Road and Blakemore Street at approximately 2:00 a.m. on July 15, 1996. She observed a car "coming diagonally across the street." McKinney testified that she then saw the Defendant

"trying to jump out or . . . hanging out [of] the car." She recalled that the car then hit a pole, that the Defendant "went up in the air and fell on the ground," and that the car kept going. McKinney stated that she got out of her car, walked over to the Defendant, and asked him if he needed help. She reported that the Defendant was bleeding and pleading for help. McKinney testified that a man then ran from the direction of the car to the Defendant, pulled on his arm, and told him to get up. The Defendant told the man that he could not get up and that he needed help. McKinney testified that the man "just panicked and started saying, Help, help, somebody help me. And then he ran." McKinney then called for an ambulance and police, and the dispatcher told her to go to the car and see if anyone was inside. McKinney testified that she walked to the car and observed Johnas Venzant, the victim in this case, lying inside the car. She recalled that the passenger door was open. She testified that she touched the victim's arm and determined that he had a pulse. McKinney waited at the scene until police arrived and relayed to them what had happened. She did not observe either the Defendant or the man who ran to the Defendant after the accident in possession of a gun, although she saw a gun when the police recovered it.

Officer W. Mathena testified that at 2:06 a.m. on July 15, 1996, he received a call regarding an accident at the intersection of Alcy and Blakemore. When he arrived at the scene, he saw the Defendant lying in the street. Mathena recalled that he asked the Defendant if he wanted an ambulance, and the Defendant responded that he did. He later found out that an ambulance was already en route to the crime scene. Mathena then observed a blue Pontiac Bonneville with the passenger door open. He testified that there was a victim inside the car who looked as if he "had been shot a few times" and who was "covered with blood." He also observed a hubcap and a baseball cap in the street. Mathena testified that after speaking to a female witness, he put out a broadcast that a black male was observed running from the scene towards the Clementine Apartments. Mathena testified that Officer Rogers located a black pistol laying in a grassy area near the Pontiac.

Officer Eric Rogers also responded to the accident call at Alcy Road and Blakemore Street. When Rogers arrived, he observed in a car a black male who had been shot. Rogers testified that while he was at the scene, he located a gun in a grassy area near the vehicle. Rogers gave the gun to Sergeant Shemwell.

Sergeant Robert Shemwell, a seventeen-year veteran of the Memphis Police Department and a member of the Felony Response Bureau of that Department, went to the crime scene at Alcy Road and Blakemore Street. Sgt. Shemwell testified that he worked the crime scene with Officer McNabb, a crime scene officer who, according to Sgt. Shemwell, died several years before the trial in this case. Sgt. Shemwell stated that when he arrived at the scene, he saw a deceased victim inside a car. Sgt. Shemwell testified that police recovered four spent cartridge casings and one spent bullet fragment from the car. He testified that a spent bullet was found in the parking lot on the south side of the Mapco store and that broken glass was also found in the Mapco parking lot. Sgt. Shemwell documented the finding of a nine-millimeter pistol found in the grassy area on the southwest corner of Alcy Road and Blakemore Street. He stated that three live rounds were found in the pistol. The pistol was later turned over to Officer McNabb.

Sergeant James L. Fitzpatrick organized the homicide investigation and reviewed findings made by the individuals who investigated the scene of the crime. He testified that he went with Sgt. Golden to the hospital and obtained a statement from the Defendant and that he also assisted in obtaining a statement from Joseph Russell, who was also charged with the victim's murder. Fitzpatrick reported that the victim was identified through fingerprinting and prior court records. The victim's pager revealed that he had received a page approximately thirty-five minutes prior to the shooting from a phone number belonging to Shemmika Fullwiley, a friend of Russell. Fitzpatrick testified that the Defendant's mother identified him at the hospital. Fitzpatrick also testified that he was told by Officer McNabb that McNabb had conducted a paraffin test on the Defendant to determine whether the Defendant had recently fired a weapon. Fitzpatrick reported that he never received any results from the test and that no such test results could be located. Fitzpatrick also stated that he could not be sure if the paraffin test was ever performed.

Donald L. Carman testified that he is a special agent for forensic science in the firearms identification area of the Tennessee Bureau of Investigation. He stated that he received for examination a nine-millimeter, semi-automatic pistol, which he determined to be operational. Carman testified that four shell casings found at the crime scene were fired from a nine-millimeter pistol. He also identified a copper fragment of a bullet found at the scene as having been fired from the pistol which he examined.

Dr. O'Brian Cleary Smith, the Shelby County Medical Examiner, performed an autopsy on the victim on July 15, 1996. According to Smith, the victim had sustained multiple gunshot wounds to the head and neck region, to the top of the right shoulder, and to the left arm. He stated that he identified six bullet paths within the victim's body which could have been made by as few as five different bullets. Smith testified that he recovered three bullets from the body and turned them over to the Memphis Police Department. He explained that three of the bullets injured the victim's spine, causing incapacitating wounds. Smith stated that the weapon that was used on the victim was close enough at the time of discharge to leave powder burns on the victim's face. Smith opined that if the victim "was the driver of an automobile and in a normal driving position at the time that the shots were fired, then the shots would come from back to front and from the right to the left primarily." Although he stated that he could not eliminate anyone in the vehicle as the shooter, based on his autopsy and photographs of the car, he was "able . . . to establish that the likelihood of the weapon being discharged came more from the rear than from the side." Finally, he testified that the victim tested positive for cocaine and marijuana, and two packets of cocaine were found on the victim's person.

Joseph Russell, who at the time of the Defendant's trial had also been charged with the murder of the victim, testified that in 1996 he had been a drug dealer for eight or nine years. Russell testified that the victim was his drug supplier and that the Defendant was another local drug dealer. Russell stated that at approximately 10:00 p.m. on July 14, 1996, the Defendant, whom Russell had never met before, approached Russell and asked to purchase a quarter-ounce of crack cocaine. Russell informed the Defendant that he did not have the quantity of "dope" that the Defendant requested and would have to contact his supplier.

Russell and the Defendant then got a ride with a man named Sterling Howard to the apartment of Russell's friend, Shemmika Fullwiley, and her roommate, Stacey Young. According to Russell, he and the Defendant remained at Fullwiley's for a brief period of time drinking beer and smoking marijuana. Russell testified that while there, the Defendant pulled out a pistol and laid it on a table. Russell reported that he picked up the pistol and told the Defendant to put it away. Russell then paged the victim. According to Russell, the victim called Russell a few minutes later, and Russell, the victim and the Defendant agreed to meet at the Mapco station because the victim said that the Clementine apartment complex where Fullwiley and Young lived was "hot" with police.

Russell testified that he and the Defendant then walked to the convenience store. As they were walking, the Defendant asked Russell how much money he owed the victim, and the Defendant told Russell that he should not pay the victim what he owed the victim. They arrived at the Mapco as the victim was walking from the store to his car. Russell recalled that all three of the men got into the vehicle at the same time. Russell got into the front passenger seat, and the Defendant got into the rear seat just behind Russell. Russell testified that after the victim got into the car, the victim started the car, passed a quarter-ounce of crack cocaine to Russell, and then asked the Defendant for money. The Defendant asked how much the victim wanted, and the victim replied by asking how much the Defendant had. According to Russell, the Defendant stated that he wanted Russell and the victim to give him "everything that's in the car," but started shooting before Russell and the victim had a chance to respond.

Russell testified that when the shooting started, the victim "jacked back in the car," and the car began to "speed up a lot." The car surged across the street and crashed into a fence. At this point, Russell jumped out of the car. Russell stated that he started running down the street and saw the Defendant lying in the street by a curb. Russell recalled that he heard the Defendant moan and then saw the Defendant stop moving. Russell testified that he did not stop to help the Defendant. However, he saw a woman driving down the street, and the woman asked him if she could help. Russell stated that he told her to call the police. Russell reported that he then ran back to Fullwiley's, where he ran inside and "threw up in their bathroom." Russell testified that he did not remain at the scene because he was "scared." Russell stated that while at Fullwiley's apartment, Fullwiley noticed blood on Russell's shirt. Russell reported that two days after the incident, he saw the incident on the news and called the police.

Shemmika Fullwiley testified that on July 14, 1996, Russell and the Defendant came to her apartment at about 11:30 p.m. She recalled that her roommate, Stacey Young, was present at the time. Fullwiley stated that after Russell paged the victim and spoke with him on the phone, Russell and the Defendant left around midnight to meet the victim at a nearby Mapco station. She testified that Russell and the Defendant were meeting at Mapco "to get some drugs." Fullwiley testified that the Defendant was carrying a gun on his person, which she saw when he and Russell left the apartment at midnight. She recalled that approximately fifteen minutes later, Russell returned to her apartment alone and immediately ran to the bathroom. According to Fullwiley, Russell was "spooked, shaking, crying . . . [and] vomiting." Fullwiley testified that Russell repeatedly told her and Young that the Defendant shot the victim. Fullwiley noticed blood on Russell's shirt and asked

him about the Defendant, and Russell said that the Defendant "couldn't get up." Fullwiley reported that Russell put on a clean shirt and instructed her to put the dirty one in a plastic bag. She testified that Russell wanted her to throw the bloody shirt away, but she did not. Fullwiley recalled that Russell left her apartment around 1:30 a.m. with a man named "Frog." She recalled that two days later, detectives visited her apartment to question her and Young.

Stacey Young testified that Russell and the Defendant came to her apartment on the evening of July 14, 1996. She stated that she saw the Defendant remove a gun from his pocket and place it on a table while Russell and the Defendant were in the apartment. When someone knocked on the door, Young saw Russell put the gun "inside [Young's] chair." Young testified that she saw that the Defendant again had the gun when Russell and the Defendant left. When Russell came back alone to the apartment, he was "spooked, paranoid." She testified that Russell had blood on the back of his shirt. Young testified that Russell said that the Defendant had tried to rob the victim. According to Young, Russell said that the Defendant couldn't get up.

## II. ANALYSIS

### A. Sufficiency of the Evidence

The Defendant argues that insufficient evidence was presented at trial to convict him of felony murder and especially aggravated robbery. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Specifically, the Defendant contends that accomplice testimony presented at his trial was not sufficiently corroborated. A criminal defendant cannot be convicted solely on the uncorroborated

testimony of an accomplice.  State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994).  "An accomplice is one who knowingly, voluntarily, and with a common intent unites with the principal offender in the commission of a crime."  State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997).  In Bethany v. State, this Court stated:

> The question of who determines whether a person is an accomplice depends upon the facts of each case.  When the facts of a witness' participation in a crime are clear and undisputed it is a question of law for the court to decide.  When such facts are in dispute or susceptible of an inference that a witness may or may not be an accomplice, it then becomes a question of fact for the jury to decide.

565 S.W.2d 900, 903 (Tenn. Crim. App. 1978); see also State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990).  "Whether the testimony of an accomplice has been sufficiently corroborated is a question for the jury."  State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999).  However, corroborating evidence need not be sufficient in and of itself to support a conviction, but it must fairly connect the defendant with the commission of the crime.  State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992).

In this case, the Defendant was convicted of especially aggravated robbery and murder in the perpetration of a felony.  Accomplice testimony established that the Defendant tried to rob the victim, and in the process, shot the victim numerous times in the head and shoulder region.  After a review of the record, we believe that there is sufficient corroboration in the record of this accomplice testimony.  Sergeant Robert Shemwell testified that four spent cartridge casings and one spent bullet fragment were recovered from inside the vehicle in which the Defendant, Russell, and the victim were reportedly riding at the time of the crime.  Dr. Smith opined that if the victim was driving the car, the gun was probably fired from behind him.  The record reveals that after forensic study, the shell casings and fragments were determined to have been fired from the weapon that Officer Eric Rogers found in a grassy area near the car.  Shemmika Fullwiley and Stacey Young testified that the Defendant had a gun on his person in their apartment earlier that night.  Fullwiley testified that the gun shown to her in court was very similar to the gun that she saw the Defendant lay on a table in her home on the night of the offense.  Stacey Young, Fullwiley's roommate, testified that when Russell ran into her apartment after the shooting, he said that the Defendant tried to rob the victim.  Fullwiley claimed that Russell said that the Defendant shot the victim.  We conclude that there was sufficient evidence to corroborate the testimony of accomplice Joseph Russell.  Accordingly, the evidence presented to the jury is sufficient to sustain the Defendant's convictions.

### B.  Lost or Destroyed Evidence

The Defendant also argues that the trial court erred in denying his request for a special jury instruction on the loss or destruction of evidence regarding the results of a paraffin test allegedly conducted on the Defendant to determine whether he had recently fired a weapon.  The Tennessee Supreme Court addressed the issue of lost or destroyed evidence in State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999).  In Ferguson, the court adopted a balancing approach to determine whether a defendant's right to a fundamentally fair trial has been affected by the loss and/or destruction of evidence.  Id. at 917-18.  Under Ferguson, when the loss or destruction of evidence occurs, the first

step is to determine whether the State had the duty to preserve the evidence in question. Id. Once the proof demonstrates the existence of a duty to preserve the evidence in question and the state's failure in that regard, the court should examine the following: (1) the degree of negligence involved; (2) the significance of the missing evidence, taken in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of other evidence used at trial to support the conviction. Id.

In this case, unlike Ferguson, it is unclear that the evidence that the Defendant now argues was lost or destroyed even existed. Sgt. Fitzpatrick testified that his notes indicated that Officer McNabb told him that McNabb conducted a paraffin test on the Defendant to determine if he had recently fired a weapon. However, Fitzpatrick testified that he never received any paraffin test results and that no test results were located. Other than Fitzpatrick's testimony, no evidence that a paraffin test was ever conducted is included in the record. The trial court determined that it could not be shown whether or not the paraffin test was conducted and, therefore, whether any test results were actually lost or destroyed by the State. We agree. After a review of the record, we have concluded that there is no substantial evidence showing that the test was ever conducted.

Nevertheless, we also conclude that even if such a test was conducted, the Defendant has failed to demonstrate that his right to a fair trial was affected by the loss and/or destruction of the evidence. See Ferguson, 2 S.W.3d at 917-18. Assuming that the police had a duty to preserve any test results, no evidence was presented that the police acted in a grossly negligent manner. See id. Furthermore, we find that there was an abundance of evidence that the Defendant shot the victim. See id. Accordingly, we believe that this issue is without merit.

## C. Sentencing

Finally, the Defendant argues that the trial court erred in sentencing him. Specifically, the Defendant argues that the trial court did not include in the record the enhancement and mitigating factors used to determine the length of the sentence. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any

statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). The presumptive sentence for a Class A felony is the midpoint of the sentencing range unless there are enhancement or mitigating factors present. Id. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

Enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114.
> The obvious purpose of these limitations is to exclude enhancement factors which are not relevant to the offense and those based on facts which are used to prove the offense. Facts which establish the elements of the offense charged may not also be the basis of an enhancement factor increasing punishment. The legislature, in determining the ranges of punishment within the classifications of offenses, necessarily took into account the culpability inherent in each offense.

State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

It appears from the record that the trial court initially merged the Defendant's convictions for felony murder and especially aggravated robbery. Thus, the trial court did not impose a sentence or

conduct any sentencing analysis regarding the especially aggravated robbery conviction. Upon reconsideration, the trial court decided not to merge the two convictions. However, the trial court simply entered a judgment stating that the Defendant was sentenced to twenty-two years incarceration for the especially aggravated robbery conviction and that the sentence was to run concurrently with the life sentence for the felony murder. There is no indication in the record that the trial court ever conducted a sentencing analysis to determine the Defendant's proper sentence for especially aggravated robbery.

The trial court did not specify in the record the enhancement and mitigating factors applied in determining the length of the Defendant's sentence for especially aggravated robbery. See Tenn. Code Ann. § 40-35-210(f). In addition, the trial court failed to place in the record any findings of fact supporting the sentence imposed. See id. § 40-35-209(c). The record is virtually void of any findings regarding sentencing. Without these findings, our Court is without a proper record for appellate review. See Ervin, 939 S.W.2d at 584. We therefore remand to the trial court for a new sentencing hearing and to make appropriate findings regarding the length of the Defendant's sentence for especially aggravated robbery. The trial court should set out specific findings of fact and conclusions of law in support of the sentence imposed.

For the reasons stated above, we AFFIRM the Defendant's convictions and REMAND this case to the trial court for a new sentencing hearing to determine the appropriate length of the Defendant's sentence for especially aggravated robbery.

_____
ROBERT W. WEDEMEYER, JUDGE