# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 14, 2002 Session

## STATE OF TENNESSEE v. WALTER CLYDE RAINEY, JR.

**Direct Appeal from the Circuit Court for Wayne County**
**Nos. 12297-12307    Robert L. Jones, Judge**

---

### No. M2001-01870-CCA-R3-CD - Filed June 6, 2003

---

The appellant, Walter Clyde Rainey, Jr., was convicted by a jury in the Wayne County Circuit Court of seven counts of sexual battery by an authority figure and seven counts of statutory rape. The trial court sentenced the appellant to a total effective sentence of four years incarceration in the Tennessee Department of Correction. On appeal, the appellant raises the following issues for our review: (1) whether the evidence was sufficient to sustain his convictions; (2) whether the trial court erred by consolidating the offenses for trial; (3) whether the trial court erred in its ruling regarding the admissibility of the testimony of prosecution witness Tabitha Smith; (4) whether the prosecution's closing argument was improper; and (5) whether the trial court erred in sentencing the appellant. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

Robert D. Massey, Pulaski, Tennessee, for the appellant, Walter Clyde Rainey, Jr.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Mike Bottoms, District Attorney General; and Joel Douglas Dicus and Robert C. Sanders, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I. Factual Background

In January 2000, the appellant was the principal and girl's basketball coach at the Frank Hughes School in Clifton. In connection with these roles, the appellant became acquainted with the victim, LNW, a student.[1] The victim met the appellant when she was in the seventh grade at the school and he was her basketball coach. Subsequently, when she was in the tenth grade, the

---

[1] It is the policy of this court to not reveal the names of minor victims of sexual abuse.

two developed a relationship that extended beyond the normal student-teacher relationship. As a result of his involvement with the victim, the appellant was indicted in the Wayne County Circuit Court on eleven counts of sexual battery by an authority figure and eleven counts of statutory rape.

At trial, the victim was the primary witness against the appellant. The victim testified that at the time of the offenses she worked as an office aid at the Frank Hughes School. She was fifteen years old at the time of the offenses. She maintained that, initially, she approached the appellant. She testified that the first sexual incident between them occurred on January 16, 2000, when the appellant invited the victim to his house. The appellant knew that the victim's parents were out of town that day. While they were in the dining room, the appellant kissed the victim and then they went into the appellant's bedroom. In the bedroom, they kissed again. The victim testified that she "told [the appellant] that my chest was part of my body as well and he beg[a]n to touch my breast." The victim also asked if the appellant would like to touch any other part of her body. In response, the appellant unzipped the victim's pants and performed oral sex on her.

Next, the victim maintained that on January 28, 2000, she went to the school gym, knowing the appellant would be there. They went into the appellant's office and began kissing. The victim testified that "I believe he started to finger me," explaining that the appellant placed his finger inside her vagina. They ended up in the "special ed room" because there were no security cameras in that room. They kissed again and the appellant digitally penetrated the victim and touched her breast. Additionally, she touched the appellant's penis.

On February 6, 2000, the victim asserted that she went to the school gym to practice basketball. She fabricated an excuse to go to the school weight room where she met the appellant. They kissed and the appellant digitally penetrated the victim and performed oral sex on her. The victim also touched the appellant's penis.

The victim further related that on February 8, 2000, during half-time of the Clifton boys' basketball game, she and the appellant went to the appellant's office and the appellant touched her breast and digitally penetrated her.

The victim stated that on February 10, 2000, the appellant drove her from the school to his home. They went into his bedroom and kissed. She testified that the appellant "put my legs over my head and he said, 'Some day I will have you like this.' Something along the lines of the first time we have sex, I'll be real gentle and I'll show you my animal side." The appellant then drove the victim back to the school. The next day, during a telephone conversation, the appellant told the victim that someone had seen her at the appellant's house and called the board of education. When the school superintendent, Jerry Pigg, questioned the appellant regarding the report, the appellant told him that he had driven the victim home to pick up a shirt for a basketball game and they stopped by the appellant's house so he could pick up a jacket.

On February 13, 2000, the victim's mother asked her if she had ever been to the appellant's house. The victim told her mother the same version of events that the appellant had told

Pigg. Afterwards, the victim informed the appellant that her mother had been asking questions, but the victim had related the appellant's version of the events. The appellant responded, "Good." The following day, the victim's mother and stepfather went to the appellant's office to speak with him. After they left, the victim went into the appellant's office, alone, and asked why her parents had been there.

The victim stated that her mother refused to allow her to attend school February 17, 2000, through February 20, 2000. Accordingly, the victim did not see the appellant during that time. The victim telephoned the appellant on February 21, 2000. The next day, the victim saw the appellant at school and he gave her a letter. After school, they went into the computer lab. The appellant attempted to kiss the victim, but she reminded him that the computer lab was monitored by security cameras. The appellant went into his office, removed the video tape, returned to the lab, and kissed the victim.

On February 26, 2000, the appellant was planning to go out of town to "let things cool off." He met with the victim at school and wrote his telephone calling card number on a piece of paper so she could call him. Concerned that the victim might drop the paper, the appellant wrote the number backwards to conceal the information. While in a classroom at the school, they kissed, the appellant again digitally penetrated the victim, and she touched the appellant's penis.

The next sexual incident occurred early in the morning of March 4, 2000. On March 3, 2000, the victim was caring for two children in their home in Clifton. The victim called the appellant and told him that she was cold. The appellant came to the children's home where the victim was staying overnight and he brought her pajamas. Later that night, the appellant tried to call the victim. She returned the call around midnight. The appellant asked if he could come to the house. The victim discouraged the appellant; however, he was insistent and around 4:00 a.m. or 5:00 a.m., the appellant drove to the home and parked his car outside the house. The victim got into the appellant's car. They kissed and the appellant digitally penetrated the victim, touched her breast, and performed oral sex on her. Additionally, the victim related that she did not recall the appellant ejaculating during any of their sexual contact.

Later the same morning, the victim returned home and asked her stepfather for permission to go to the school gym. She arranged for Jessica McIntosh to meet her there. The victim also called the appellant and told him that she was going to the school gym. The appellant agreed to meet her there. When there, they kissed and touched and then went into the coaches' office to avoid being seen by McIntosh. The appellant told the victim that he loved her. He kissed her breast and performed oral sex on her. During this encounter Jessica McIntosh began beating on the door of the gym. The victim went to meet McIntosh who asked if the appellant was at the school. The victim stated that he had been there earlier and suggested they look for him. While McIntosh was searching elsewhere, the victim returned to the coaches' office and warned the appellant that he should leave. The appellant informed the victim that he would go to his office. The victim then told McIntosh that she had found the appellant in his office.

The victim testified that later in the evening of March 4, 2000, she returned to the school gym with her sister and McIntosh to play basketball. The appellant came back to the school and went into the counselor's office with the victim. In the counselor's office, the appellant performed oral sex on the victim. She maintained that

> after he got finished then he told me to sit between his legs and I did and he said, "Now, don't . . . do anything you don't want to do," and I told him, "I didn't do anything I didn't want to do." He told me, he said to lick the tip of my finger and to put it on the head of his penis. Well, I did it and I thought this is just going to take forever. He is just going to walk me through this whole thing so I just put it in my mouth and performed oral sex on him.

The appellant instructed her to stop before he ejaculated.

The victim also asserted that she and the appellant performed oral sex on each other in a room beside the school office on March 5, 2000. Additionally, she contended that she saw the appellant in the school gym on the night of March 6, 2000, and she performed oral sex on him.

Next, the victim recalled that on March 15, 2000, she left on a school trip to Washington D.C. The day before her trip, she told the appellant that she wanted to see him before she left. On the afternoon of March 14, 2000, the victim and the appellant met in an equipment room at the school and she performed oral sex on the appellant. The victim asserted that she talked to the appellant on the telephone regularly while she was on her three-day trip. The victim testified that she paid for the long-distance calls by using the appellant's calling card number which he had previously given her. At approximately 1:00 a.m. on March 18, 2000, the day the victim returned from her trip, she arranged to meet the appellant at a factory located behind her house. On this occasion, they only kissed.

On the night of March 18, 2000, the victim arranged to go to the school gym with McIntosh. The victim informed the appellant of her plans. The victim and the appellant kissed in a corner near steps located outside the gym. The victim returned to the gym and talked with McIntosh. McIntosh began acting strangely around the victim, and McIntosh's father soon came to the school to drive her home. The victim went to the appellant's office and started to perform oral sex on the appellant. He stopped her, saying, "[W]e don't need to do this in here." The appellant proceeded to inform her that "I have got something in mind that is like mutual pleasure." They went into the counselor's office and began to perform oral sex on one another in what "is commonly known as the sixty-nine position."

On March 22 or 23, 2000, Agent Vance Jack with the Tennessee Bureau of Investigation (TBI) talked with the victim. Originally she denied the events, explaining later that the appellant "made me feel good about myself and I looked upon him as a father figure and I was trying to protect him because I didn't want him to get in trouble, you know." However, the victim soon confessed to a sexual relationship with the appellant. Agent Jack asked the victim to write a statement detailing her involvement with the appellant. She complied.

At trial, the victim maintained that the appellant "manipulated me into doing things," but she conceded that the appellant did not threaten her. She explained, "It was hard to tell [him] no. I trusted [him] and I looked at him as a father figure and, you know, I had feelings for [him]." Additionally, she stated that the appellant told her that he looked at her as a daughter.

The victim revealed that sometime after she made her statement to Agent Jack, the appellant wrote her a letter and contacted her about delivering a letter to her. Subsequently, the appellant drove past the victim's house, dropped the letter in the street, and drove away. The victim went into the street to retrieve the letter and, pursuant to the appellant's instructions, burned the letter after reading it.

The victim also testified that on two occasions she recorded her telephone conversations with the appellant. The audio tapes of those recorded conversations were played for the jury. During one conversation, the victim asked the appellant what he had told investigators. After asking the victim if she was alone, the appellant and the victim discussed the conversations each had with the officials. At one point, the victim asked the appellant what he thought would happen if she revealed everything about their relationship. The appellant responded that if more were told the situation would only worsen. She also told the appellant that she had informed the "FBI" that he had "fingered her." The appellant did not deny the victim's comments, but simply said "ah." The victim also asked the appellant if he intended to "tell them that I'm lying" and further inquired if the appellant was "going to make me out to be crazy." The appellant responded that he did not know what he was going to tell authorities.

Agent Vance Jack testified at trial that he and Agent Wayne Wesson initially investigated the case against the appellant. Because the victim denied a sexual relationship with the appellant, the investigation was closed. However, following a report of the incident witnessed by McIntosh, the investigation was reopened. Agent Jack stated that when he interviewed the victim following McIntosh's report, the victim was reluctant and embarrassed, but he overcame such feelings by building a rapport with her. Agent Jack opined that writing a statement is often easier than verbally recounting events, so he asked the victim to write a statement about her relationship with the appellant. She gave this statement to Agent Jack on March 23, 2000. Subsequently, the victim submitted a more detailed statement on March 28, 2000. Agent Jack admitted that there was no physical evidence, such as fingerprints or DNA samples, to confirm the victim's version of events.

Additionally, Agent Jack testified concerning his investigation of the appellant's telephone records. He stated that on February 28, 2000, there were two calls placed to the Holiday Inn in Brentwood which originated from the victim's residence and utilized the appellant's calling card number. There was a similar call the following day. The total length of these three calls was thirty-three minutes. On March 7, 2000, there were three calls utilizing the appellant's calling card number. These calls were placed from Murfreesboro to the appellant's residence. The total duration of these three calls was forty-two minutes. There was another such call lasting seventeen minutes

which occurred the next day. Additionally on March 8, there were two calls utilizing the appellant's calling card number. The two calls originated from Murfreesboro and were placed to the private line of the appellant's office at the Frank Hughes School. These calls lasted a total of fifteen minutes. On that same day, the appellant placed a one minute call to a motel in Murfreesboro. The appellant was also billed for two calls, with a total length of four minutes, from the Nashville Airport on March 15, 2000, to his office at the school. Furthermore, on March 15 and 16, 2000, while the victim was on a school trip, there were eight calls placed to the appellant's residence from Maryland, utilizing the appellant's calling card number.

The victim's younger sister, Natalie Crystal Watson, testified that she also attended Frank Hughes School. Watson observed that by the end of their relationship, it seemed that the victim and the appellant were together every day. Watson stated that she sometimes went to basketball games with the victim and the appellant. They would take the driver's education car and often the appellant allowed the victim to drive even though she did not have a driver's license. Watson stated that during one particular trip, she saw the appellant hold the victim's hand the entire way home. The appellant often called their home and spoke with the victim. Additionally, Watson remarked that the victim and the appellant made an effort to touch each other. Moreover, the appellant gave the victim his keys to the school gymnasium so she could practice basketball. Furthermore, Watson remembered that on January 16, 2000, while Lisa Allen was at Watson's house, the victim called Watson from the appellant's house. Watson knew the call originated from the appellant's house because she saw the appellant's number on the caller identification system. The victim returned home at approximately 10:30 p.m. that night. Watson saw the appellant bring the victim home.

Watson further explained that when she went with her sister to the school gym to practice basketball, the victim rarely stayed in the gym with her. The victim and the appellant would leave the gym and go into the weight room or the office.

At trial, Jessica Elaine McIntosh testified that she and the victim were good friends. McIntosh confirmed that she saw the appellant and the victim "French kissing for a long time" on March 18, 2000. McIntosh expounded that "French kissing" means "[u]sing the tongue." She further described the kiss as "passionate" and related that the appellant had his arms on the victim's waist and her arms were around his neck. McIntosh stated that afterward, the victim returned to the gym to resume basketball practice. Shortly thereafter, McIntosh informed her father of what she had witnessed and together they went to see their minister.

Jane Martin, a social studies teacher at the Frank Hughes School, testified that the position of office aid was a desirable job. She also related that she was aware that the victim had been allowed to drive the driver's education car. Additionally, Martin stated that she often saw the appellant and the victim alone together.

Gina Watson Grace, the victim's mother, testified that the victim's date of birth was July 13, 1984. Grace stated that the appellant was the principal at the Frank Hughes School, which

school her children attended. Additionally, the appellant coached the victim when she played junior high basketball. Subsequently, the appellant began coaching the high school girl's basketball team, of which the victim was a member. He also gave the victim extra help to improve her basketball skills. Grace also noted that her caller identification system reflected that the appellant had frequently telephoned her home. While these calls had been deleted from the main system, the backup system she kept in her bedroom reflected the calls. Grace related that the appellant had asked for her permission to purchase the victim a Christmas present and she had given her permission.

In January, Grace became "suspicious" of the appellant's relationship with the victim. In part, Grace's suspicions stemmed from changes in the victim's behavior. She became more rebellious and wanted to spend more time at school or at ball games. She often asked permission to ride home with the appellant. Grace also noticed that the victim and the appellant were always looking at each other. Based upon her suspicions, Grace and her husband went to the Frank Hughes School at 10:00 a.m. on February 14, 2000, and confronted the appellant. Grace informed the appellant that his relationship with the victim was inappropriate and caused people to think that he was "screwing" her daughter. She instructed the appellant to not check the victim out of school without Grace's permission and also told the appellant that the victim was not to drive the driver's education car because she did not possess a driver's license. Grace also demanded that the victim's job as an office assistant be discontinued and warned the appellant that he was not to spend any time alone with the victim in his office. To emphasize her displeasure with the appellant's behavior, Grace sent a formal complaint to the Board of Education.

Grace maintained that the appellant never denied having an inappropriate relationship with the victim. However, he did deny that the victim had ever been inside his house. The appellant assured Grace that the victim would not continue to work in the office. Nevertheless, Grace maintained that after this meeting, the victim continued to leave school without Grace's permission, to drive the driver's education car, and to work in the office at school.

Raymond Paul Coggins testified that in February 2000, he and the appellant attended an administrator's academy in Nashville. They shared a room during the trip. While they were there, the appellant received a telephone call from a young woman. The appellant never identified the caller, but Coggins "interpreted" that the call was from one of the appellant's daughters.

Stacey Baker testified that on March 30, 2000, after the appellant's suspension because of his relationship with the victim, she witnessed the appellant drop an envelope in the road outside the victim's house. The victim retrieved the envelope. Baker conceded that she did not know the contents of the envelope.

Byron Skelton, the Chief of Police for the City of Clifton, related that he was called to the victim's house after Baker reported the letter incident. Chief Skelton retrieved the remains of a burned note.

Gailand Grinder, an employee of the Wayne County Board of Education, testified that in February, the Board was notified that the victim and the appellant had been seen entering the appellant's house. An investigation ensued. On February 16, 2000, Grinder talked with the appellant at the school. The appellant mentioned that Grace had warned him to never be alone with the victim. The appellant informed Grinder that he would no longer be alone with the victim.

Grinder stated that there was a meeting on March 20, 2000, concerning the appellant's conduct. Grinder; Jerry Pigg, the Wayne County Superintendent of Schools; and Joe Treece, a school board member from Clifton, attended the meeting. Additionally, David McIntosh, the father of Jessica McIntosh, came to the meeting to relate the kissing incident witnessed by his daughter. When Grinder and Pigg confronted the appellant about the incident, he denied any wrongdoing. Originally, the appellant claimed that he did not remember being at the school that day. As the questioning progressed, the appellant eventually conceded that he was at the school and saw the victim, but he came no closer to her than three feet. Additionally, the appellant initially denied talking with the victim on the telephone, but later admitted that she would occasionally call him. The appellant admitted that he gave the victim a Christmas present and acknowledged that he did not give presents to any other students. Grinder testified that the appellant maintained that he did not curtail his contact with the victim after the original accusations because he did not want it to appear that he had done anything wrong.

Cindy Davis, a first grade teacher at the Frank Hughes School, testified as the first defense witness. Davis asserted that the victim approached her after the relationship with the appellant was exposed and told Davis that "what you've heard about me, it's not true. I don't care what a lot of people think, but I care what you think about me." Davis conceded that the victim did not specify to what her comment referred.

Heather Warren, another teacher at the Frank Hughes School, stated that she was also the victim's basketball coach and had a good rapport with her. Warren noted that the victim had sometimes spent the night at her house, she had given the victim rides home, and she had taken her shopping. Warren also related that the appellant often had students in his office and she never saw any improper sexual contact between the appellant and the victim.

The appellant's daughter, Rebecca Raney,[2] testified that she befriended the victim. She explained that the appellant was a "father figure" to the victim and she never saw behavior between them that differed from any other teacher-student relationship. Furthermore, Raney stated that she was with the appellant for most of the day on February 6, 2000.

Stephanie Kennedy, a former student at the Frank Hughes School, attested that while she was working at the Pirate's Lair Restaurant, the victim approached her and declared, "If you hear that I have had sex with [the appellant] it is not true." Kennedy noted that she was not a particularly

---

[2] The indictment spelled the surname of the appellant "Rainey"; elsewhere in the record, the family surname is spelled "Raney."

close friend of the victim. She also observed that the appellant was in jail when the victim made the statement.

Tina Bowling, the Frank Hughes School secretary, explained that the position of office aid was considered an "honor." The appellant recommended the victim for the position and Bowling agreed that she was qualified. Bowling remarked that she saw no inappropriate conduct between the appellant and the victim. She also stated that the victim told her that "what you read in the paper is not true."

The appellant's oldest daughter, Sara Raney, testified that she was also with the appellant on February 6, 2000. They were in Birmingham, Alabama, for a family outing.

To conclude the defense proof, the appellant testified on his own behalf. He stated that he was fifty-seven years old. He became acquainted with the victim when he was her junior high basketball coach and he also tutored her in basketball. The appellant maintained that the victim needed someone to talk with and she sent him an e-mail message that she wanted to "perceive" him as a father figure. He did not recall if he responded to the message, but stated that he did want to help the victim.

The appellant acknowledged that the victim called him when he attended an academic seminar in Nashville. He stated that he may have told Coggins that the call was from his daughter. According to the appellant, the victim called to ask about the appellant's relationship with a former Frank Hughes School student, Tabitha Smith. The appellant also admitted that he gave the victim his calling card number, but contended that he did so in order for her to telephone her father. He confirmed that he wrote the calling card number backwards as a security measure in case she lost the number. The appellant also noted that he called the victim once from Birmingham to ask if the weather had affected a basketball game. Additionally, the appellant admitted that he allowed the victim to drive the driver's education car even though she did not have a license to drive. Regardless, he denied ever having sexual contact with the victim. The appellant explained that on the day McIntosh alleged she saw him kiss the victim, he and the victim were discussing the victim's medical problems and he put his arms around her and kissed her on the forehead to offer comfort.

The appellant observed that his female students occasionally developed crushes on him. He opined that a rivalry over him developed between the victim and Tabitha Smith. Furthermore, the appellant explained that in the conversations that the victim recorded, he did not deny sexual contact with her because he was "in shock." He was warned as part of his bond agreement that he should not have contact with the victim, but she continued to call and he listened while she talked. The appellant admitted that despite the warning not to contact the victim, he delivered to her a letter filled with inspirational sayings because she had requested that he do so.

He denied holding the victim's hands while they rode together in the driver's education car, but admitted that he did "warm" her hands on one occasion while she was driving. He also denied picking the victim up at her home, taking her to his home, then returning her to her

residence on January 16, 2000. However, he conceded that he did drive past her house that day. Furthermore, he asserted that he heeded Grace's warning to limit contact with the victim. Nevertheless, she "called [him] all the time." In any event, the appellant never asked the victim to stop calling him.

The appellant contended that he told Pigg and Grinder different versions of events because of a faulty memory, not because of a desire to deceive. As to his failure to deny a sexual relationship with the victim on the audio tape, the appellant stated that he remained silent because he did not understand and did not respond because he was listening. Additionally, he wanted to obtain legal advice before responding. The appellant asserted, "I never initiated contact with that girl. . . . She's the one that made the calls." On cross-examination, the State asked the appellant about the victim's "competition" with Smith for his affections. The appellant stated that he was never involved in a sexual relationship with Smith.

As a rebuttal witness, the State called Tabitha Smith, a recent graduate of the Frank Hughes School. She testified that after her graduation, while she was eighteen years old, she was involved in a sexual relationship with the appellant. Furthermore, in February 2000, the victim asked Smith about her relationship with the appellant. The victim was jealous because of rumors concerning Smith's involvement with the appellant.

Based upon the foregoing proof, the jury convicted the appellant of seven counts of sexual battery by an authority figure and seven counts of statutory rape. The trial court sentenced the appellant to a total effective sentence of four years incarceration. On appeal, the appellant challenges the sufficiency of the evidence supporting the convictions, the consolidation of the offenses for trial, the admission of Smith's testimony, the State's improper closing argument, and the sentences imposed.

## II. Analysis

The appellant first challenges the sufficiency of the evidence to support his convictions of sexual battery by an authority figure and statutory rape. In Tennessee, appellate courts accord considerable weight to the verdict of a jury in a criminal trial. In essence, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence,

are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Tennessee Code Annotated section 39-13-506(a) (1997) defines statutory rape as the "sexual penetration of a victim by the defendant or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least four (4) years older than the victim." Statutory rape is designated a Class E felony. Id. at (c). Additionally, Tennessee Code Annotated section 39-13-527(a)(1)(A) (Supp. 1998) provides:

> (a) Sexual battery by an authority figure is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by all of the following circumstances:
>
> (1) The victim was, at the time of the offense, thirteen (13) years of age or older but less than eighteen (18) years of age; and . . .
>
> (A) The defendant had, at the time of the offense, supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used such power to accomplish the sexual contact.

Sexual battery by an authority figure is designated a Class C felony. Id. at (b).

The appellant's main complaint is that the victim was an accomplice to the offenses as a matter of law and there was insufficient evidence presented to corroborate her testimony. "An accomplice is defined as a person who knowingly, voluntarily, and with common intent with the principal offers to unite in the commission of a crime." State v. McKnight, 900 S.W.2d 36, 47 (Tenn. Crim. App. 1994). This court has observed that "[a] child can be an accomplice in a sex-related case. When a child is deemed an accomplice, the testimony of the child, like an adult, must be corroborated." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997) (footnote omitted).

Generally, "a defendant cannot be convicted upon the uncorroborated testimony of [an] accomplice[]." McKnight, 900 S.W.2d at 47. In other words,

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.

Henley v. State, 489 S.W.2d 53, 56 (Tenn. Crim. App. 1972). "The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration." State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). Additionally, such corroborative evidence may be direct or circumstantial. See State v. Spadafina, 952 S.W.2d 444, 450 (Tenn. Crim. App. 1996).

The trial court found that the victim was an accomplice as a matter of law because she effectively consented to sexual relations with the appellant. On appeal, the State argues that this finding was error. If the proof at trial indicated that the victim "did not voluntarily consent, as in the case of rape, force, threats, fraud or undue influence, she is not an accomplice." Scott v. State, 338 S.W.2d 581, 583 (Tenn. 1960). The State contends that the

> entire crux of the State's case was that the [appellant], by virtue of his position of authority as the victim's principal and basketball coach, brought undue influence to bear on the victim, who was experiencing problems at home with her stepfather and was vulnerable to the [appellant's] manipulations. Indeed, that is the intent behind the crime of sexual battery by an authority figure.

Black's Law Dictionary 1529 (7th ed. 1999) defines undue influence as "[t]he improper use of power or trust in a way that deprives a person of free will and substitutes another's objective." At trial, the victim testified that the appellant "manipulated me into doing things"; however, she maintained that she engaged in the sexual acts because she "had feelings for [the appellant]." We cannot conclude that the proof at trial established that the victim's consent was involuntary or that the appellant's influence was such that the victim was deprived of her free will. Moreover, even if, as the State suggests, the exertion of undue influence is the harm sought to be curtailed by the law against sexual battery by an authority figure, corroboration would nevertheless be required to sustain the appellant's convictions for statutory rape. Accordingly, having concluded that the trial court correctly determined that the victim was an accomplice to these crimes, we must now determine if sufficient evidence exists to corroborate her testimony.

The appellant was found guilty of sexual battery by an authority figure and statutory rape based upon the events of January 16, 2000. As we noted *supra*, the victim testified that on January 16, her parents were out of town and the appellant picked her up at her house after she finished baby-sitting her brother. The two went to the appellant's house where the appellant touched her breasts and performed oral sex on her. Watson asserted that the victim left a note explaining that she had gone to the appellant's house. She called her home from the appellant's house, which call her sister confirmed by answering the telephone and checking the caller identification system. The victim testified that the appellant took her home, and the victim's sister testified that she observed the appellant bring the victim home. The appellant denied seeing the victim on this occasion, but admitted that he drove by her house.

The appellant was found guilty of sexual battery by an authority figure and statutory rape based upon his digital penetration of the victim on February 8, 2000, during the half-time of the Clifton boys' basketball game. Additionally, the appellant was found guilty of the two offenses for the events of March 3, 2000, when the appellant came to the residence where the victim was babysitting and performed oral sex on her in his car. On March 4, 2000, the appellant also performed oral sex upon the victim in the coaches' office, but they were interrupted by McIntosh knocking on the office door.

-12-

Additionally, the appellant was convicted of sexual battery by an authority figure and statutory rape based upon the appellant and the victim performing oral sex on each other in the school counselor's office on March 5, 2000. The appellant's convictions for March 14, 2000, were based upon the victim's performance of oral sex upon the appellant in an equipment room at school.

"Generally, the question of corroboration of an accomplice's testimony is for the jury to determine." State v. Robert Allen Garner, No. 03C01-9205-CR-00178, 1993 WL 3474, at *4 (Tenn. Crim. App. at Knoxville, Jan. 11, 1993). The victim's accounts of these offenses were corroborated in general by the testimony of Watson and Grace, which testimony recounted the general behavior of the victim and the appellant toward each other. They frequently touched each other and would not break eye contact with each other. Watson was often with the appellant and the victim when they were in the driver's education car and witnessed them act especially familiar with each other. Particularly, Watson noted that the appellant spoke so softly to the victim that Watson was unable to overhear their conversation. Moreover, Watson maintained that, when she and the victim went to the school to practice basketball, the victim and the appellant would go into the weight room together. Grace asserted that the victim began to be particularly rebellious where the appellant was concerned and noted that the appellant frequently called her home. The appellant also gave the victim keys to the school gym. Additionally, Jane Martin testified that the appellant was often alone in his office with the victim, more often than with any other student. Furthermore, Agent Jack testified concerning numerous calls to the appellant which were billed to the appellant's calling card number, calls which originated from places the victim was staying.

Finally, the appellant was also found guilty of sexual battery by an authority figure and statutory rape based upon the events of March 18, 2000. Jessica McIntosh witnessed the appellant and the victim kissing "passionately" on this date. McIntosh testified that the appellant and the victim were still at the gymnasium when she left. Subsequently, the victim and the appellant went into the counselor's office and performed oral sex on each other.

Moreover, the State contends that the appellant made two "tacit admissions" to the sexual contact with the victim. The State argues that the first such admission occurred when Grace confronted the appellant at the school on February 14, 2000, and the appellant did not deny a sexual relationship with the victim. The State postulates that the second tacit admission occurred when "the victim was taping her conversation with him and he remained silent, only sighing, when confronted with her statement that she told the authorities that he had 'fingered' her."

> Our courts have recognized that
> when a statement is made in the presence and hearing of one accused
> of an offense and the statement tends to incriminate him, or is of an
> incriminating character, and such statement is not denied or in any
> way objected to by him, both the statement and the fact of his failure
> to deny it or make any response to it, is admissible against him as
> evidence of his acquiescence in its truth.

-13-

Ledune v. State, 589 S.W.2d 936, 939 (Tenn. Crim. App. 1979). Before a tacit admission may be used as evidence against a party, several requirements must be met. "First, the party against whom it is used must have heard and understood the other person's statement." Neil P. Cohen, et al., Tennessee Law of Evidence, § 8.06[4][d], at 8-44 (LEXIS publishing, 4th ed. 2000). After satisfying that requirement, it must next be established that the subject matter of the accusation must be within the knowledge of the party. Id. Additionally, "the party must have been physically able to communicate a clarification or disagreement." Id. As a final requirement, "the circumstances must have been such that the party would probably have responded if he or she disagreed with the statement." Id. An example of a tacit admission is "silence in the face of a damning accusation." Id.

In relation to the first proposed tacit admission, we note that Grace confronted the appellant by saying to the appellant,

> You can go ask two of your most trusted staff and ask them, "Do you think I am screwing [the victim]?" . . . and if you like them and . . . you trust them, they'll tell you, "Yes." Her friends think you are screwing her.

Grace asserted that the appellant did not deny an inappropriate relationship with the victim. Additionally, the victim later called the appellant and told him that she had informed the authorities that he had "fingered" her. After being informed of this statement, the appellant only sighed. We conclude that, in both instances, the jury could have considered the appellant's silence as a tacit admission of the accusations against him. See State v. Lyon, 648 S.W.2d 957, 959 (Tenn. Crim. App. 1982). We conclude that, based upon all the foregoing proof, the jury could have found that the victim's testimony regarding the offenses was sufficiently corroborated.

## B. Consolidation of Offenses

As his second complaint, the appellant contends that the trial court erred "by consolidating the eleven (11) indictments for the purposes of trial in this cause." Initially, we note that the appellant did not include in the record for our review a copy of the transcript of any proceedings related to this issue. Thus, the appellant has waived this issue on appeal. See Tenn. R. App. P. 24(b). "[T]his Court will not speculate what the missing portions of the record may or may not reveal." State v. Keen, 996 S.W.2d 842, 844 (Tenn. Crim. App. 1999).

## C. Smith's Testimony

As his third issue, the appellant contends that "[t]he trial court erred in its rulings regarding the admissibility of the testimony of prosecution witness Tabitha Smith." The appellant argues that Smith's testimony was irrelevant, or, if relevant, was improperly admitted without a proper hearing in compliance with Tennessee Rule of Evidence 404(b).

On direct examination, the appellant stated that the victim called him while he was attending a seminar in Nashville. According to the appellant, the victim called to inquire about the appellant's relationship with Smith, a former student. The appellant theorized that the two females

were in a "competition" or "rivalry" for his affections. However, on cross-examination, the appellant denied having a sexual relationship with Smith.

Following the conclusion of defense proof and while the jury was out of the courtroom, the State informed the trial court that it wished to call Smith as a rebuttal witness to attack the appellant's credibility. The trial court stated that if the evidence was regarding "other misconduct" by the appellant, the court must first conduct a hearing in compliance with Tennessee Rule of Evidence 404(b) and further stated, "I consider what we're doing now is the jury out hearing under 404." However, the appellant never formally requested such a hearing. At the conclusion of the "hearing," the trial court determined that it would allow Smith's testimony, finding "that it is not offered under Rule 404 to prove character in general or the propensity to engage in certain conduct, but to test the credibility of the witness."

Before the jury was brought back in the courtroom, the State made an offer of proof regarding Smith's testimony. Smith asserted that she had sexual relations with the appellant and that the relationship began "[t]wo weeks before the August of '99 school year" and lasted until June or July 2000. Smith explained that she had graduated from high school in May 1999 and was eighteen years of age at the time of the relationship. Smith informed the court that in February 2000 the victim talked to Smith concerning Smith's relationship with the appellant.

Following this proffer, the trial court observed that neither the appellant or Smith were married to other people at the time of the offenses. Additionally, Smith was eighteen years old when the relationship began and she was no longer a student. Accordingly, the trial court determined that their relationship "would not be a crime, it would not be a – necessarily a bad act, even." The trial court further explained:

> I don't think it's a 404 situation, but at the same time, in case it falls under any of these rules, the four hundred rules, or the six hundred rules, or any others, the Court finds that this evidence is probative. One, on the credibility of the [appellant], significantly probative on that issue. Also, it may have some probative and corroborative value on the relationship alleged by [the victim], which might cause a usual and natural feeling of jealousy if there was any word getting around about that, during the early months of 2000. So, I think for both reasons, it's probative in this case. . . .
>
> [The testimony is corroborative to] explain the reasons for the phone calls and why [the victim] would have cared about those kind of things, because of the alleged relationship between her and [the appellant] at that time.

The jury was then brought back into the courtroom. Smith testified that she began a sexual relationship with the appellant shortly after her graduation from Frank Hughes High School and the affair lasted for several months. Smith stated that the appellant was principal of the school

when she was a student at the high school. Smith related that she was eighteen years old at the time of her sexual relationship with the appellant. Smith also asserted that in February 2000, she was confronted by the victim regarding her relationship with the appellant. On cross-examination, Smith admitted that she told a defense investigator that she had not had sex with the appellant. However, Smith maintained that she later confessed the truth to the investigator. Smith testified that after the victim found out about Smith's relationship with the appellant, she would "chase [Smith] around and honk her horn" and would "run up on [Smith] and flip birds at [Smith]." Smith opined that the victim's behavior was a result of jealousy.

As we noted earlier, the appellant has essentially raised this issue under Tennessee Rule of Evidence 404(b). Such rule provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Generally, the trial court has the discretion to admit evidence under Rule 404(b). See State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997).

Regardless, to ensure compliance with this rule, several "protective procedures" must be followed prior to the admission of the contested evidence. State v. James, 81 S.W.3d 751, 758 (Tenn. 2002). To begin, the trial court, *upon request*, must hold a jury-out hearing concerning the admissibility of the other acts evidence in order to determine whether the proffered evidence is relevant to prove a material issue other than the character of the accused. Id. In the instant case, as we have mentioned, the appellant never formally requested a Rule 404(b) hearing. Nevertheless, it appears that the trial court and the appellant were in concert in believing that such a hearing was necessary.

"Second, upon a finding of relevance, the court must find and state on the record the specific issue to which the evidence is relevant." Id. The trial court determined that the proffered testimony was relevant to the appellant's credibility and to corroborate that the victim perceived a relationship between herself and the appellant. Finally, we note that the trial court balanced the probative value of the evidence against its prejudicial effect and concluded that the probative value of the evidence outweighed any unfair prejudice. Id. Based upon the trial court's statements, it is clear that the court determined that the evidence was probative to the appellant's credibility and that,

-16-

because the contested testimony concerned behavior that was not "necessarily a bad act, even," the probative value outweighed any possible prejudicial effect.

This court has also noted that "[a]ny competent evidence which explains or is a direct reply to, or a contradiction of, material evidence introduced by the accused, or which is brought out on his cross-examination is admissible in rebuttal." Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979). In other words, "'[r]ebutt[al] evidence' is that which tends to explain or controvert evidence produced by an adverse party." Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979). The admission of rebuttal evidence is within the sound discretion of the trial court and we will not over turn the trial court's decision absent an abuse of that discretion. See State v. Dellinger, 79 S.W.3d 458, 488 (Tenn. 2002).

As we earlier noted, the trial court determined that Smith's testimony regarding her sexual relationship with the appellant "may have some probative and corroborative value on the relationship alleged by [the victim], which might cause a usual and natural feeling of jealousy if there was any word getting around about that, during the early months of 2000." We agree. Accordingly, we conclude that the trial court did not abuse its discretion in permitting the State to demonstrate that the appellant was being less than candid with the jury. See State v. Tom Harris, No. 86-273-III, 1988 WL 63535, at *4 (Tenn. Crim. App. at Nashville, June 23, 1988).

## D. Improper Closing Argument
In his next issue, the appellant complains that the State made several "objectionable remarks" during the course of closing argument. Specifically, the appellant challenges the following remarks:

(1) "I *think* he thinks that nobody can stop him and he can do anything he wants to do."
(2) When addressing the jury about telephone records, the prosecutor stated "Not the kind of calls you have with a student or your principal. Who do *you* call when *you* go out of town? Do *you* call your friends usually when *you* go out of town for a few days? No. Do *you* even call *your* other relatives, *your* brothers or sisters that *you* are just out of town for a few days? Who do *you* call?
(3) "If a girl calls *me* up and says, 'I just told somebody you raped me. That you put your finger inside me.' If it is not true, what are *you* going to say? *You* are going to jump up and down."
(4) "[The appellant] betrayed every citizen of Wayne County to trust him."
(5) "If Jessica hadn't seen them kissing and brought it all out and got it all in the open, he would probably be protected today and he would be the principal in Clifton *teaching our kids* and that's true."
(6) In reference to [the victim's] testimony, the prosecution stated in reference to the closing remarks made by defense counsel, "they can't

offer any explanation as to why she might say this, put herself through the embarrassment, put her through this agony that she went through a whole day on this stand, drilling other than vendetta or vengeance."

(7) In reference to the [appellant's] statements made during a tape recorded telephone conversation the prosecution stated "If I am innocent, *I'll tell you* what I'll agree to."

(8) "As far as I'm concerned I don't care how many master's degrees he has got. I don't care how many degrees he has . . . I don't care what kind of education he had. He don't have a license to come into Wayne County and do this to one of our children."

The appellant contends that all of these remarks were improper "appeals to the jury based on sympathy, prejudice, or bias." However, the appellant did not object to any of the foregoing statements during the State's closing arguments. Therefore, the appellant has waived this issue. Tenn. R. App. P. 36(a); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Nevertheless, we conclude that the State did not commit reversible error by making the statements.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

"(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]

(2) the curative measures undertaken by the court and the prosecution[;]

(3) the intent of the prosecutor in making the statement[;]

(4) the cumulative effect of the improper conduct and any other errors in the record [; and]

(5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The State initially contends that "[i]tem 1 is not personal opinion. While a prosecutor may not express a personal opinion or belief, comments during argument prefaced by phrases such as 'I think' or 'I submit' are unlikely to be adjudged opinions." Furthermore, the State argues that "[i]tems 2, 3, 5, 6, and 7 relate either to the [appellant's] explanation of his phone calls to the victim or the [appellant's] statements during his taped conversations with the victim." Finally, the State explains, "Items 4, 5, and 8 address the [appellant's] evidence and argument relating to his character as an educator and his experience and education, brought out during his closing argument."

We note that the State has correctly stated the law regarding this court's evaluation of "I think" and "I submit" phrases. See Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). In our view, items 2, 3, 6, and 7 are fair comments regarding the evidence. Id. With regard to items 4, 5, and 8, we observe that "[a]rguments concerning deterrence and appeals to the jury to

-18-

act as the community conscience are not necessarily impermissible." Pulliam, 950 S.W.2d at 368. Furthermore, after taking into consideration the aforementioned factors from Pulliam, we conclude that "the prosecutor's argument was not so inflammatory that it affected the verdict to the appellant's detriment." Id. at 369.

### E. Sentencing

Finally, the appellant contends that he should have been granted judicial diversion or granted probation. Appellate review of the length, range or manner of service of a sentence is de novo. Tenn. Code Ann. § 40-35-401(d) (1997). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102 and -103 (1997), -210 (Supp. 2002); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentences. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant does not contest the length of his sentence; again, his complaints center around the trial court's denial of judicial diversion and probation. Tennessee Code Annotated section 40-35-313(a)(1)(A) (Supp. 1998) provides:

> The court may defer further proceedings against a qualified defendant and place such defendant on probation upon such reasonable conditions as it may require without entering a judgment of guilty and with the consent of the qualified defendant. Such deferral shall be for a period of time not less than the period of the maximum sentence for the misdemeanor with which the person is charged, or not more than the period of the maximum sentence of the felony with which the person is charged.

At the conclusion of such probationary period, the defendant may apply to the court for the expungement of the conviction(s) from all official records. Id. at (b). This process is known as judicial diversion.

It is within the trial court's discretion to grant or deny judicial diversion. See State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). As such, the trial court's decision will be overturned only if the court abused its discretion. Id. In other words, we will not interfere with the denial of judicial diversion if the record contains any substantial evidence to support the trial court's refusal to grant diversion. Id. Moreover, we observe that "judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under [Tennessee

Code Annotated section] 40-15-105." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

The trial court must consider all of the following factors in determining whether to grant the appellant judicial diversion:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the status of the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice--the interests of the public as well as the accused.

State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997). The record must reflect that the trial court has taken all of the preceding factors into consideration. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Furthermore, "[t]he court must explain on the record why the [appellant] does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id.

Additionally, we recognize that an appellant is eligible for probation if the sentence actually imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a) (1997). Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing. Tenn. Code Ann. § 40-35-102(6). Taking the foregoing factors into consideration, we conclude that the appellant is presumed to be a favorable candidate for alternative sentencing. However, this presumption may be rebutted by "evidence to the contrary." State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Zeolia, 928 S.W.2d at 461. Moreover, "[t]he same guidelines are applicable in diversion cases as are applicable in probation cases, but they are more stringently applied to those seeking diversion." State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1 (Tenn. 2000). Thus, we will begin our review with a determination of the appellant's suitability for probation.

Initially, we note that, instead of a court reporter's transcription of the evidence produced at the sentencing hearing, this court was instead provided with a synopsis of the proof as written by counsel for the State and the appellant. This synopsis was approved by the trial court. Counsel produced the synopsis "based on the fact that the tape recording of the sentencing hearing

was inaudible and, as a result, the court reporter was unable to reproduce same for the purpose of filing a typed, verbatim transcript of the testimony presented and the opening statements and arguments of counsel."

The statement of evidence reflects that the appellant filed "Letters In Support of Walter Clyde Raney, Jr." to act as mitigation. The State filed as exhibits the appellant's presentence report and the psychological report of Dr. John W. Lancaster which was prepared in compliance with Tennessee Code Annotated section 39-13-705 (1997).

Jerry Pigg, the superintendent of schools for Wayne County, testified at the sentencing hearing that the appellant's "activities prior to being indicted were a hot topic amongst the teachers and other citizens of Wayne County." Pigg noted that the appellant's offenses "put a black eye on the school and the school system." Furthermore, Pigg asserted that many people, within and without the school system, were paying attention to the outcome of the appellant's sentencing hearing. Finally, Pigg concluded by observing that the appellant was aware that, a few years prior to the appellant's offenses, another teacher at the same school had been convicted of the statutory rape of a student.

TBI Agent Vance Jack testified that at the time of the sentencing hearing there were forty-eight (48) defendants serving sentences in the Tennessee Department of Correction for violations of the sexual battery by an authority figure statute. However, Agent Jack was unaware of how many defendants convicted of that statute were on probation.

Gina Grace, the victim's mother, testified that on February 14, 2000, she instructed the appellant to discontinue his relationship with the victim. Moreover, Grace noted that the victim "had encountered confrontations at school, was sometimes nervous and upset, and that her reputation had suffered."

In sentencing the appellant, the trial court "review[ed] the exhibits and the law." After reading the supportive letters, the trial court observed that it was impressed by the record of the appellant as an educator and noted that "during his 30 years as an educator he had helped all kinds of people of varied race, age, and background." However, the trial court further observed that "[t]he seriousness of these offenses cannot be overlooked."

The trial court acknowledged that the appellant had an extensive history as an educator and had no history of criminal conduct, but determined that the instant offenses were serious offenses "against the educational system itself." The court further recognized that the appellant was presumed to be an appropriate candidate for alternative sentencing. However, due to the seriousness of the offense and the need for deterrence, the court denied the appellant probation and judicial diversion. Specifically, the court noted that the appellant "should be placed on the sexual registry so that he can't be in a position so that he is exposed to young people not having supervision by other adults." Finally, the court determined that "split confinement is not appropriate

in this case because the Wayne County Jail is overcrowded and [the appellant] had Clorox thrown on him when he was incarcerated there prior to his making bond."

Even given the limited sentencing record before us, it is obvious that the trial court considered the appellant's lack of criminal history and his community support. Regardless, the trial court determined that the seriousness of the offenses and the deterrence factor outweighed the positive factors in support of alternative sentencing.

First, we will address the seriousness of the offenses. When imposing confinement based upon the seriousness of the offense, the trial court must first determine if "'the circumstances of the offense[s] as committed [are] especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree.'" Zeolia, 928 S.W.2d at 462 (quoting Bingham, 910 S.W.2d at 454). At trial, the proof revealed that over the course of several months, the appellant repeatedly sexually abused the victim, a student with whom he had developed a "father figure" relationship. The sexual relationship continued even after the appellant was instructed by Grace to leave the victim alone because there were rumors of an inappropriate sexual relationship. In fact, there had even been an inquiry into the appropriateness of the appellant's behavior prior to Jessica McIntosh's witnessing the appellant kissing the victim. Despite the warnings of the inappropriateness of his conduct, the appellant nevertheless pursued his sexual relationship with the victim, only stopping when the relationship was exposed by McIntosh. We conclude that these facts justify a denial of probation based upon the seriousness of the offenses. Furthermore, because the probation guidelines are more stringently applied to an appellant seeking judicial diversion, we further conclude that the trial court properly denied diversion on the basis of the seriousness of the offenses. See State v. George William King, No. M2001-02026-CCA-R3-CD, 2002 WL 31520648, at *4 (Tenn. Crim. App. at Nashville, Nov. 13, 2002).

The trial court also determined that diversion and probation should be denied based upon the deterrent effect of the appellant's incarceration. In State v. Hooper, 29 S.W.3d 1, 10-12 (Tenn. 2000), our supreme court specifically noted five factors for consideration when denying probation solely upon the basis of deterrence:

(1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole.
. . . .
(2) Whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior.
. . . .
(3) Whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case.
. . . .

(4) Whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective.

. . . .

(5) Whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

First, we note that Pigg testified that the appellant was aware that a few years prior to the instant offenses another teacher at the same school was convicted of the statutory rape of a student. Nevertheless, the appellant chose to engage in a sexual relationship with a student, which could indicate an increase in the presence of such offenses. Moreover, the repetitive nature of the appellant's crimes demonstrates the "intentional" or "knowing" nature of his conduct. Hooper stated that "[a]ctions that are the result of intentional, knowing, or reckless behavior . . . are probably more deterrable than those which are not the result of a conscious effort to break the law." 29 S.W.3d at 11. Pigg also maintained that the appellant's case was being carefully scrutinized by the community, particularly by those within the school system. Our supreme court has stated that "[c]riminal acts by a professional in his or her official capacity, for example, need not be publicized statewide before deterrence may be considered as a factor. In most cases, substantial publicity within the defendant's professional community would probably suffice to meet this factor." Id. Finally, in encouraging the sexual relationship with the victim, the appellant was arguable engaged in a criminal enterprise with her. Thus, the trial court properly considered the effect of the appellant's incarceration in denying probation and judicial diversion.

> Additionally, in the appellant's psychological report, Dr. Lancaster observed: Information on these scales indicate a high level of minimization in the form of denial related to the charges. Information obtained from his probation officer indicates that he was not particularly honest during his trial in relation to phone cards, involvement with a minor and involvement with use of school property by the victim. This information along with information obtained on the test would indicate someone who is denying their involvement in this crime. He had a high level of minimization as noted previously which is also indicative of many individuals who have been accused and convicted of sexually inappropriate sexual behaviors. Where there is apparently no indication of anyone being victimized in the past, individuals that, in my experience, have had similar profiles have many past victims.

Clearly, considering the doctor's assessment, the appellant has failed to take responsibility for these offenses, demonstrating poor rehabilitative potential. See State v. Bell, 69 S.W.3d 171, 175 (Tenn. 2002). Accordingly, the trial court did not err in its denial of probation or judicial diversion.

### III.  Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

 

_____

NORMA McGEE OGLE, JUDGE